**William K. BOWES, Edwin L. Bowes, Franklin B. Bowes, Marion R. Bowes, Kathryn B. Clark and Mary B. Diehl, Plaintiffs-Appellants,**

v.

**SAKS & COMPANY, a New York Corporation, Defendant-Appellee.**

**No. 16381.**

United States Court of Appeals Seventh Circuit.

May 27, 1968.

Wayland B. Cedarquist, Barnabas F. Sears, Chicago, Ill., Boodell, Sears, Sugrue & Crowley, Chicago, Ill., of counsel, for appellants.

Maurice G. Shanberg, Sherwin J. Stone, Chicago, Ill., Marshall & Marshall, Chicago, Ill., of counsel, for appellee.

Before SWYGERT and FAIRCHILD, Circuit Judges and MAJOR, Senior Circuit Judge.

PER CURIAM.

William K. Bowes, Edwin L. Bowes, Franklin B. Bowes, Marion R. Bowes, Kathryn B. Clark, and Mary B. Diehl brought an action against Saks & Company seeking damages for breach of a clause in a lease by Saks & Company as lessee. The district judge granted summary judgment for Saks & Company. We affirm and adopt as the opinion of this court the memorandum opinion of the district judge which follows in the appendix.

APPENDIX

This is a landlords' suit for damages against their former tenant for breach of a clause in the lease to "deliver to said lessors said demised premises in good order * * * including the restoration of said premises as near to its original condition as practical." Conceding that no restoration has been made, the lessee nonetheless moves for summary judgment, basing its claim on the peculiar but largely undisputed facts now of record.

I have considered the complaint, the lease, the motion, the extended briefs of the parties, the affidavits of record and attached documents. Defendant's motion is granted.

The undisputed facts, and the disputed facts as Lessors see them, are as follows: Plaintiffs ("Lessors") owned the St. Clair building in downtown Chicago, which is located across an alley from the building of defendant, Saks & Co. ("Saks"). In a lease commencing January 1, 1946, Saks leased the fourth and fifth floors of Lessors' building. During the term of the lease, the leased premises were in the following condition, which was consistent with the expectations of the parties at the time the lease was signed: a bridge was in place across the alley, attached to Lessors' building at an opening in the building's west wall, an opening in the fifth floor existed to accommodate a staircase, and numerous partitions and doors had been removed from both the fourth and fifth floors. At the expiration of its leasehold, Saks was required by the lease to make the following repairs and restorations: removal of the bridge, restoration of the building's west wall where the bridge was connected,[1] and restoration of the floor partitions and doors.[2] It is undisputed that Saks had these obligations under the lease (and extensions of it), and that the restorations were not made. Lessors claim that this breach of the covenant to restore caused them damage, that the cost of the repairs contemplated in the lease is $115,000, that additional expenses and attorneys fees have been incurred in the attempt to enforce the lease, and that they are entitled to judgment in the amount of $150,000. Saks claims that Lessors have suffered no damage as a consequence of the failure to restore and that this is plain from the record as it now stands. The validity of Saks' argument depends on the curious history of Lessors' now completed sale of the St. Clair building.

The lease between Lessors and Saks, with its extensions, expired on April 30, 1966. Prior to the expiration, Lessors offered the building to Saks for $675,000 and Saks refused. Thereafter, in early 1966, Lessors and Saks conducted negotiations on a possible cash payment by Saks to Lessors in lieu of actual restoration. The parties discussed a $52,000 payment in exchange for a release from the covenant to restore. An appropriate agreement providing for a payment in this amount was drafted by Lessors' attorney and forwarded to Saks' attorneys.

The agreement was never signed by Saks; it is not claimed by Lessors to have become binding, nor could it be. While the negotiations were pending, Lessors put their building up for sale. A real estate sales contract, dated February 14, 1966, was delivered by Lessors, as sellers, to the purchaser on February 25, 1966, with final terms agreed upon on March 1, 1966. The sale price was $750,000; the contract said nothing about restoration of the fourth and fifth floors. The building was to change possession on May 2, 1966, two days after expiration of Saks' lease. It appears that Saks was unaware of this impending sale during the early stages of negotiations for release of the covenant to restore.

Saks claims that *it* was responsible for failure to consummate the agreement. Its version of the story is that when it discovered the impending sale of Lessors' building, Saks demanded the purchaser's signature on the release. Saks claims that Lessors refused to obtain the signature and that this was the reason for the end of these negotiations in failure. Lessors adamantly contend that they terminated negotiations. In support of this view they submit a letter, dated March 10, 1966, addressed to Saks from one of the Lessors representing Lessors' "Realty Company." The letter, which is

---

1. Paragraph 8 of the lease.

2. Paragraph 19 of the lease.

a crucial document in this case, reads as follows:

"Saks & Company
611 Fifth Avenue
New York, New York

"Gentlemen:

"Inasmuch as you have not seen fit to execute the agreement which our attorneys sent you expressing the terms discussed between us with respect to a cash payment by you to us, in lieu of restoring the fourth and fifth floors of the St. Clair Office Building as per your lease, and in view of the shortness of the time before the expiration of the extension of the lease and the amount of time required to restore the premises, you are hereby notified that all negotiations with respect to said cash settlement are hereby terminated.

"Please restore the premises in accordance with the terms of the lease as extended and remit your rent for the month of April when it is due.

Very truly yours,

. . . . . . . . . . . . . . . . . . . .
Franklin B. Bowes
Bowes Realty Company"

On March 31, 1966, one month prior to the termination of the Saks lease, Saks and the purchaser of the building entered into a new lease for a three-year term. As a result, at the end of its lease with Lessors, Saks retained possession of the fourth and fifth floors and did not restore the premises. On May 2, 1966, the building changed hands as scheduled. The purchaser has not claimed return of any portion of the $750,000 purchase price from Lessors. Lessors' counsel has stipulated that Lessors have not spent any money for the physical restoration of the premises leased to Saks. Lessors claim damages for breach of the covenant in the amount of $115,000, the cost of doing what Saks failed to do.[3]

■ In the ordinary lessor's suit for breach of a covenant to restore, the lessor is entitled to damages he actually suffers. Two rules are commonly applied to measure these damages:

"A lessee who breaches a provision of the lease requiring him to make certain repairs or to deliver up the premises at the termination of the lease in a certain condition is liable in damages for the reasonable cost of making such repairs or of putting the premises in the condition prescribed by the lease." Crystal Concrete Corp. v. Town of Braintree, 309 Mass. 463, 470, 35 N.E.2d 672, 675 (1941).

This is the general rule. However, it is not an absolute rule.

"But the plaintiff is not to be put in a better position than it would have been if the defendant had performed the terms of the lease. The location and character of the demised premises must be considered; and the reasonable cost of repairs, in some instances, would furnish the proper measure of damages while, in other instances, the value of the premises may be such that the incurrence of expense for repairs would not be a reasonable, practical or economical method of dealing with the property. Such expense might greatly exceed any diminution of the fair market value of the land that was caused by the defendant's nonperformance of the provisions of the lease." Ibid.

■ Cost of repairs is merely a convenient way to quantify the damage a lessor has suffered. Where the facts indicate that cost of repairs is unrelated to lessors' actual damage, the rule is not applied. Pennsylvania Cement Co. v. Bradley Contracting Co., 11 F.2d 687, 688 (2d Cir. 1926) (L. Hand, J.).

"In an action for breach of contract, as opposed to a suit sounding in specific performance, the lessor is entitled only to the damages that were caused to the property by the failure to restore. Where the expense of restoration exceeds

---

3. There is also a claim for expenses and attorneys fees incurred "to enforce the obligations of defendant under said lease."

These damages depend entirely on the award of repair damages.

the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages." *Dodge Street Building Corp.* v. *United States,* 341 F.2d 641, 644, 169 Ct.Cl. 496, (1965). If the "cost of repair" rule will give lessors a greater benefit from the breach than could be gained from full performance, a different measure of damages must be applied to avoid injustice. *Peevyhouse* v. *Garland Coal & Mining Co.,* 382 P.2d 109, 113 (Okla.1963). Accord, *Giordano* v. *Brandywine Mushroom Corp.,* 32 Pa.Dist. & Co. R.2d 522, 525–26 (1963). And see *Realty Associates* v. *United States,* 138 F.Supp. 875, 134 Ct. Cl. 167 (1956).

The rule is analogous to the doctrine governing breach of construction contracts, most clearly stated by Judge Cardozo in *Jacob & Youngs, Inc.* v. *Kent,* 230 N.Y. 239, 129 N.E. 889 (1921). "The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value." 230 N.Y. at 244, 129 N.E. at 891. Accord, McCormick, Damages § 168.[4]

■ Applying these rules, Lessors can recover nothing here. The undisputed facts, and the disputed facts taken as Lessors see them, plainly show that Lessors have suffered no damage *as a result* of Saks' failure to restore the premises. Consequently, cost of repair damages would be wholly unrelated to the loss, which does not exist. The diminution of value rule yields Lessors nothing because Saks' conduct did not cause a diminution.

Lessors cannot claim as damages the out-of-pocket expenditures required to perform the restoration. No such expenditures have occurred. Furthermore, no such expenses will occur. No one is asking Lessors to restore the building; the building's present owner neither wants restoration, nor could he permit it, in view of his lease with Saks.

Similarly, Lessors cannot claim damages for diminution of value of an interest in property which they do not own. They have sold the building, and they retain no present or future interest in it.

■ The alternative is a claim for lost profit on the sale of the building. If Saks' breach reduced the price Lessors received *or could have received* for their building, Lessors have been damaged. If Lessors suffered such damage at all, they suffered it on March 1, 1966, the date on which sale of the building was completed, at an irrevocably fixed price. Saks' conduct thereafter could not affect the sale price. But, this is a suit for breach of a covenant to restore the premises "at the expiration of the within lease." By these very terms, no actual breach could have occurred prior to April 30, 1966, the date the lease expired and two months after Lessors suffered their damage, if any. Actual breach of the covenant is not, and cannot possibly be, Lessors' theory of recovery.

All that can be left is a complaint for lost profits allegedly resulting from *anticipatory* repudiation of the covenant. In this connection, Lessors would be required to show that Saks did one of the following acts by March 1, 1966:

"(a) a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot

---

4. The Seventh Circuit appears to have held that the diminution in value rule always governs in cases based on breach of covenant to return the premises in the same condition as they were in when leased, at least in Indiana. See *Henry H. Cross Co.* v. *Rice,* 45 F.2d 940, 943 (7th Cir. 1930). The Court relied on two Texas cases. Texas is the only jurisdiction which distinguishes repair cases from restoration cases, and applies the diminution of value rule in all of the latter. See 80 A.L.R.2d 983, 1017 (1961). If this is the controlling rule in Illinois—no Illinois authority suggests that it is—the cost of repair rule cannot even be considered in the present case.

substantially perform his contractual duties;

\*   \*   \*   \*   \*   \*

"(c) any voluntary affirmative act which renders substantial performance of his contractual duties impossible, or apparently impossible." Restatement, Contracts § 318.

Saks never threatened a breach of the covenant. At no time was "a positive statement" made to Lessors or anyone else indicating that the premises would not be restored, unless Lessors expressly released Saks from the covenant under the terms of the proposed agreement, which was never executed.

Lessors do not claim that a binding contract exists or existed as a result of these negotiations; the undisputed facts show that there is and was none. The most Lessors claim is an agreement "in principle." On March 1, 1966, Saks continued to be legally bound on its convenant to restore; it retained the option of restoring rather than paying $52,000, and remained subject to Lessors' option to require restoration rather than accept $52,000.

■   Was the agreement "in principle" a positive statement indicating that Saks would not perform? The facts show that it was not. Lessors' attorney thought negotiations on the release were still open on March 10, 1966, ten days after Lessors sold the building at a fixed price. In his letter to Saks of that date, quoted above, he announced "all negotiations \* \* \* are hereby terminated." In his affidavit, Lessors' attorney claims that "negotiations by the Plaintiffs and the Defendant for the payment of a sum of money for the satisfaction of the obligation of the Defendant to restore said premises were terminated \* \* \* by the Plaintiffs by a registered letter dated March 10, 1966." Surely if the agreement was sufficiently insecure in March to permit Lessors' unilateral declaration that there was and would be no release, it was similarly not final as to Saks. Under these circumstances, Saks' agreement "in principle" was not a positive statement indicating

agreement to the release, and it was therefore not a positive statement indicating a future breach. These negotiations alone cannot be considered as an anticipatory repudiation of the covenant to restore.

The question remains whether Saks did "any voluntary affirmative act which renders substantial performance of his contractual duties impossible, or apparently impossible." Restatement, Contracts § 318(c). The only relevant Saks behavior was the failure to begin restoration on or before March 1, 1966. Restoration was plainly a major undertaking; if it were true that restoration would have been impossible if not begun by March 1, 1966, Saks might be charged with anticipatory repudiation. However, the letter from Lessors' attorney rests on the assumption that restoration could have been completed between March 10, 1966, and April 30, 1966. Saks' attorney acknowledged that it would take "several weeks." The burden is on Lessors to show that such completion would have been impossible and to overcome the clear implication of their attorney's letter. No dispute is even raised under these admitted facts.

■   Lessors claim that they were damaged by selling their building in "as is" or "gutted" condition. But the facts plainly show that this was entirely a matter of Lessors' choice. They could have communicated their demand for restoration prior to the sale, they could have relied on Saks' covenant to restore, or they might even have assigned their rights under the covenant to the purchaser. Since there was neither a breach, a threat of breach nor an anticipatory repudiation on or before the day of the sale, Lessors could have sought full value for a restored building on that day. That they chose not to do so is hardly chargeable to Saks.

Having sold their building on their own terms, Lessors cannot now claim damages for a subsequent failure to restore. When Lessors terminated negotiations on March 10, 1966, by letter, they

said to Saks: "Please restore the premises in accordance with the terms of the lease. * * *" But on that date, Lessors had no conceivable interest in restoration. The building had been sold on March 1, 1966, at an irrevocably fixed price, to a purchaser who did not want restoration. Lessors cannot recover damages for Saks' failure to perform a restoration of no value to them.

■ This case turns on the fundamental rule that contract damages are supposed to compensate a loss and not provide a windfall. Lessors have suffered no loss for which Saks can be blamed; an award of damages would be an outright gift, unrelated to any conduct of Saks.