454 F.2d 184
 ASSOCIATED STATIONS, INC., a Virginia corporation, and USCO,
Inc., a Virginia corporation, Appellees,
v.
CEDARS REALTY AND DEVELOPMENT CORPORATION, a Mississippi
corporation, and Magnolia Homes Manufacturing
Corporation, a Mississippi corporation,
Appellants.
 No. 71-1476.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 2, 1971.
Decided Jan. 17, 1972.
 
 Thomas H. Atkins, Richmond, Va. (G. Kenneth Miller, and May, Garrett & Miller, Richmond, Va., on brief), for appellants.
 George C. Rawlings, Jr., Fredericksburg, Va., for appellees.
 Before HAYNSWORTH, Chief Judge, and WINTER and RUSSELL, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Associated Stations, Inc. (Associated), a Virginia corporation, leased certain property to Cedars Realty and Development Corporation (Cedars), a Mississippi corporation engaged in the manufacturing of mobile homes.[1] After the lease expired, Associated sued to recover for damages to its property. Finding Cedars liable, the district court gave judgment in the amount of $42,858.00. We agree with the district court's conclusion that Cedars was liable to Associated for damages to the leasehold; however, we conclude that the district court erred in using the "cost of restoration" standard in assessing damages. Therefore, we vacate the judgment and remand the case to the district court for a redetermination of damages.
 
 
 2
 * In the fall of 1964, Associated leased to Cedars 32.46 acres, improved by two large quonset type buildings suitable for manufacturing as well as offices and storage areas, located at Doswell, Virginia. The term of the lease was from November 30, 1964 to November 30, 1967,[2] with rent payable in monthly installments of $1,150.00. The lease provided, inter alia, that Cedars was to maintain the premises in good repair and upon termination of the lease to leave the premises in good repair, to remove all rubbish, and to return the keys to Associated.[3]
 
 
 3
 In the latter months of 1966, Cedars decided to move its operations to Georgia and to discontinue all business at the Doswell site. This fact was known in the community because of its effect on jobs and because of two auctions held by Cedars to sell certain property. Although Cedars never formally communicated to Associated its intention to vacate the premises, Associated was aware of Cedars' plans to discontinue its operations in Virginia.
 
 
 4
 Cedars' closing operations occurred over a number of months. Regular production personnel were still on the site two days before Christmas, in 1966, and various supplies and materials, including a forklift truck, were still on the property in the early months of 1967. Despite the fact that Cedars claims that it intended to cease all operations, no effort was made to clear the property of rubbish, return the keys to Associated, or to restore the buildings which had been modified for Cedars' operations to their former condition. Additionally, Cedars continued to pay the monthly rent, the checks being sent to Associated from Cedars' office in Georgia.
 
 
 5
 Sometime around the end of January or the beginning of February, 1967, an employee of Cedars returned to the Doswell property to retrieve the forklift truck. He noticed that an air-conditioning unit was missing from one of the buildings. He reported this fact to his superior, but this information was never conveyed to Associated. In March, of 1967, Mr. George Thomas, the president of Associated, visited the property and found that a considerable amount of vandalism had occurred.[4] Windows, doors, and wiring, as well as plumbing and electrical fixtures, had been damaged. Holes were found in the roof and several of the heating motors and electrical switches required replacement. In addition, the special heavy-duty wiring which had been used by a previous tenant in the midfifties had been torn out and removed. Mr. Thomas made several more visits to the property and on each successive occasion he found more damage, but this damage was minor in comparison to what was originally found. The district court found that the bulk of the damage had occurred prior to Thomas' March, 1967 visit.
 
 
 6
 After Associated regained possession of the property, it repaired some of the damage and made certain modifications of the facilities to accommodate a new tenant, Fiberlay Corporation, to which the property was let in May, 1968. Thereafter, Associated instituted this suit in the district court to recover $47,620.00 which it alleged would be the aggregate cost of restoring the property to its former condition. Of this sum, $11,900.00 was actually expended by Associated, including $2,800.00 for modifications for the new tenant. The remaining $35,720.00 was never spent. This figure included $27,500.00 to replace and repair the special heavy-duty electrical wiring required by Cedars' predecessor. In 1970, Fiberlay Corporation purchased the property for $152,000.00.
 
 
 7
 The district court found that Cedars was liable for the damage caused by the vandalism and awarded Associated $43,858.00. It arrived at this sum by taking Associated's estimated cost of repairs ($47,620.00) and reducing it by 10%. Cedars thereupon appealed.
 
 II
 
 8
 Cedars contends that Associated, knowing that the property had been vacated and that vandalism was occurring, had a duty to protect the property from further damage and that having failed to do so, is barred from holding Cedars responsible for damages. Cedars' argument need not detain us long. The district court found that Associated had not accepted a surrender of the property and that the property had not been abandoned. Even after all manufacturing had ceased, Cedars continued to use the property for storage in the early part of 1967. Cedars made no effort to comply with the provisions in the lease with respect to surrender and, throughout the period in question, it continued to pay the monthly rental. Manifestly, the district court was not clearly erroneous in finding neither an abandonment nor a surrender. It follows that Cedars was not relieved of its responsibility to protect the property.
 
 
 9
 Nor do we think that under the facts of this case Associated was required to reenter the property in order to prevent further vandalism. Where an injured party is in a position to prevent further loss to himself by a reasonable expenditure of money or effort, he is required to do so. Haywood v. Massie, 188 Va. 176, 49 S.E.2d 281 (1948); Stonega Coke & Coal Co. v. Addington, 112 Va. 807, 73 S.E. 257 (1912). But, in determining what is reasonable, regard must be had for all the circumstances. In the present case, Cedars concedes that the property was difficult to secure. Presumably, this difficulty was as great for Associated as Cedars. In any event, there is nothing to suggest that by a "trifling inconvenience," or even a reasonable effort, Associated could have prevented the damages. See Haywood v. Massie, supra, 49 S.E.2d at 284. Moreover, it was not until the great majority of the damage had been done that Associated was aware of the situation. We agree with the district court that Cedars has failed to demonstrate that by a reasonable effort Associated could have prevented the loss.[5]
 
 III
 
 10
 In assessing damages, the district court used the "cost of restoration" standard. Damages were based on the amount it would have cost to restore the property to the condition it had been in when the property was leased to Cedars. This is the general rule for determining damages to leasehold property in Virginia. See Sharlin v. Neighborhood Theatre, Inc., 209 Va. 718, 167 S.E.2d 334 (1969); Vaughan v. Mayo Milling Co., 127 Va. 148, 102 S.E. 597 (1920); Moses v. Old Dominion Iron and Nail Works Co., 75 Va. 95 (1880). In none of these cases, however, was there any contention that the cost of restoring the property to its former condition greatly exceeded any benefit to the market value of the property. Cedars has made this very assertion-that the cost of repair does exceed any benefit to the value of the property-and thus we have no controlling Virginia ruling on this point.[6]
 
 
 11
 The object of damages in a contract case is to restore the plaintiff to the position he would have been in had the contract not been breached.[7] The "cost of restoration" method is one convenient way of determining the amount of damages to be awarded the plaintiff where a breach had occurred. There are, however, certain situations where this method of computing damages does not restore the plaintiff to the position he would have been in had the contract not been breached, but rather places him in a better position, thus providing him with a windfall. In those cases, courts have resorted to alternative methods of computing damages in order to insure that, as far as possible, the plaintiff neither loses nor benefits from the breach. As the court in Crystal Concrete Corp. v. Town of Braintree, 309 Mass. 463, 35 N.E.2d 672 (1941), stated:
 
 
 12
 [T]he plaintiff is not to be put in a better position than it would have been if the defendant had performed the terms of the lease. The location and character of the demised premises must be considered; and the reasonable cost of repairs, in some instances, would furnish the proper measure of damages while, in other instances, the value of the premises may be such that the incurrence of the expense for repairs would not be a reasonable, practical or economical method of dealing with the property. Such expense might greatly exceed any diminution of the fair market value of the land that was caused by the defendant's nonperformance of the provisions of the lease.
 
 
 13
 Id. at 675.
 
 
 14
 We think the present case is similar to Bowes v. Saks & Company, 397 F.2d 113 (7 Cir. 1968). In Bowes, the lease provided that on its termination the property was to be returned to the landlords in the same condition that it had been when it was let to the lessees. The tenants in that case altered the property by building a bridge across an alley; and, at the expiration of the lease, the landlords sought to recover $115,000.00, which they claimed was the cost of removing the bridge and restoring the wall in the building where the bridge had been connected. During the term of the lease, the landlords sold the property, with settlement to be made two days after the expiration of the lease. Prior to the expiration of the lease, the tenant entered into a three-year lease with the new purchaser and thus its interest in the building continued. No effort was made by the new purchaser either to have the building restored or to recover part of the purchase price from the original landlords because of the lack of restoration. In a suit by the original landlords to recover damages for breach of the covenant to restore the premises, the court declined to permit the landlord to recover the cost of restoration because the value of the building was not diminished by the tenant's failure to restore it, and, therefore, the landlords suffered no loss from the breach. Bowes v. Saks & Company, supra, 397 F.2d at 117; accord Dodge Street Building Corp. v. United States, 341 F.2d 641, 169 Ct.Cl. 496 (1965); Crystal Concrete Corp. v. Town of Braintree, supra.
 
 
 15
 In the absence of any controlling Virginia precedent, we think that the rule set forth in Bowes and the cases cited therein is the most appropriate for application in the present case. Included in Associated's estimate for the cost of repairing the property was $27,500.00 to replace special heavy-duty electrical wiring which had been used last by a former tenant in the fifties. Expert testimony was to the effect that the value of the property at the expiration of the lease in 1967, assuming no vandalism, was $116,945.00, and that in 1970 when the property was sold it was valued at $134,700.00. The expert testimony was also that had the special heavyduty wiring been replaced, its replacement value of the property either in 1967 or in 1970. Thus, Associated expended $9,665.00 and was successful in selling property worth $134,700.00 for $152,000.00, realizing thereby a profit of $7,635.00. If Associated were to recover also $27,500.00 as the estimated cost of replacement of the electrical wiring which Associated has no intention of replacing and which would have no effect on the market value of the property, Associated would realize a windfall of $27,500.00.[8] Since, in this case, the use of the "cost of restoration" method of determining damages would probably do more than place Associated in the position it would have been in had Cedars not breached its agreement, we think the use of this method inappropriate. Rather, Associated should be permitted to recover the cost of restoration or the diminution in market value, whichever is less. In the event that diminution in market value is less, and so becomes the measure of recovery, Associated should also be permitted to recover the salvage value, if any, of the property removed by Cedars or others and not replaced by Cedars. Under this formula, Associated will not realize unjust enrichment, but it will be fully protected from any actual loss.
 
 
 16
 We have referred to the expert testimony with regard to the market value of the subject property in 1967 and in 1970. And, at one stage of the proceedings, the district court purportedly found the market value to be $131,950.00 as of an undisclosed date. But our study of the record discloses that the case was tried as to damages on the basis that Virginia law required damages to be assessed by the "cost of restoration" standard in all events without recognition of the exceptional case in which slavish devotion to the doctrine will result in unjust enrichment. Although we have concluded this case is in the latter category, we recognize that the evidence as to market value may not have been as fully developed, not the finding of the district court as fully considered, had the relevance of market value been recognized at the outset. In remanding to the district court for reassessment of damages in the light of this opinion, we direct that the parties be given a reasonable opportunity to present additional evidence of market value, the district court being free to make findings in this regard anew.
 
 
 17
 Vacated and remanded.
 
 
 
 [1]
 The original lessors were USCO, Inc. and Dixie Trailer Equipment Manufacturing. The name of USCO, Inc. has been changed to Usry Investment Corporation and Associated Stations, Inc. has succeeded to Dixie's interest. Magnolia Homes Manufacturing Corporation, the parent of Cedars, was also joined as a defendant
 
 
 [2]
 The term was later amended to run from January 1, 1965 to December 30, 1967
 
 
 [3]
 Paragraphs 5 and 6 of the lease provide as follows:
 
 
 [5]
 Lessee will comply with all lawful requirements of local and state health boards, police and fire departments. County, Municipal, State and Federal authorities, and the Board of Fire Underwriters respecting the use of the premises and will make any improvements not of a structural nature required by said authorities
 Lessee will keep and maintain the premises in good condition and repair; keep in good running order all heating and air conditioning systems, electric wiring, toilets, water pipes, water, gas and electric fixtures; replace all locks, trimmings, glass and plate glass broken during the term of this lease; unstop all water fixtures that may become choked and repair all water pipes and plumbing that may burst. Lessee will not make any alterations of. additions to or changes in the premises. except after first obtaining the written consent of Lessors, and all alterations of, additions to or changes in the premises, except after first obtaining the written consent of Lessors, and all alterations, changes and improvements, by whomsoever made, shall be the property of Lessors. The foregoing shall not apply to any equipment used in Lessee's business which may be attached to the premises and Lessee may remove such equipment at the termination of this lease. It shall, however, repair and replace any and all damage done to the premises by such removal.
 
 
 [6]
 Lessee covenants to leave the premises in good repair. damages by fire, act of God, or other casualty excepted, and upon surrender of possession will have all rubbish removed, the premises thoroughly cleaned, and will deliver to Lessors all keys to the premises
 
 
 [4]
 The president had made an earlier visit to the property. On that occasion he found that all operations had ceased, but that Cedars' materials were still on the property
 
 
 [5]
 Under Virginia law, mitigation of damages is an affirmative defense, and the burden of proof rests entirely on the party breaching the contract. See Foreman v. E. Caligari and Company, Inc., 204 Va. 284, 130 S.E.2d 447 (1963)
 
 
 [6]
 Green v. Burkholder, 208 Va. 768, 160 S.E.2d 765 (1968), cited by Associated for the proposition that the "cost of restoration" standard still applies, is distinguishable
 In Green, the parties assumed that damages were to be determined by the cost of restoration method and thus all the evidence went to the issue of how much it would cost the plaintiff to perform the breached contract. No evidence was submitted to show the present market value of the property or the effect the restoration might have on that market value. Nevertheless, the trial judge refused to permit the issue of damages to go to the jury because the plaintiff had not demonstrated that defendant's breach adversely affected the value of his property.
 The Supreme Court of Appeals reversed the trial court, holding that since the case was tried on the cost of repair theory and not the market value theory, "it [was too] late for the defendants to say that the proper measure of damages was the difference between the before and after value of the property." Id. at 767. Although the court did apply the cost of restoration rule, nothing in the opinion suggests that this rule should be applied exclusively in all situations. Indeed, the court indicated that its application in that case was proper because the damages to be awarded under the rule would not be grossly disproportionate to the harm suffered and would not involve economic waste. The view we take of the instant case is consistent with the latter statement.
 
 
 [7]
 Although the instrument in this case is a lease, the lease itself contains mutual covenants which are subject to contract principles. See generally, 3A Corbin, Corbin on Contracts, Sec. 686 (1960)
 
 
 [8]
 This sum was part of a larger sum of $35,720.00 which Associated never spent. By referring only to the $27,500.00 we do not mean to imply that Associated can recover the balance of the larger sum. Indeed, we do not decide what damages are to be recovered. We refer to the electrical wiring and its costs only by way of example since it was an item of considerable cost but having little or no relation to market value of the property