PITTSBURGH–DES MOINES STEEL CO.,
Plaintiff-Counter-Defendant-Appellant,

v.

BROOKHAVEN MANOR WATER CO.,
Defendant-Counter-Plaintiff-Appellee.

No. 75–1009.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1975.

Decided March 2, 1976.

Robert G. Schloerb, Ellen J. Kerschner, Chicago, Ill., for appellant.

B. John Mix, Jr., Chicago, Ill., for appellee.

Before CLARK, Associate Justice (Retired),* and CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

This is an appeal by the Pittsburgh-Des Moines Steel Company (hereinafter PDM) from the district court's entry of a judgment notwithstanding the verdict against PDM on its complaint for repudiation of contract and for Brookhaven Manor Water Company (hereinafter Brookhaven) on its counterclaim for breach of contract and from the district court's subsequent adjudgment of damages. The questions raised on appeal are whether the district court erred in entering judgment notwithstanding the verdict in favor of Brookhaven on the liability issue and whether error was committed in the district court's subsequent assessment of damages against PDM.

The record discloses the following series of events. On July 24, 1968, PDM, a designer, fabricator, and engineer of steel products, submitted a proposal to Brookhaven for the construction of a one-million-gallon water tank for $175,000. The original proposal incorporated, as terms of payment, 60 percent upon receipt of materials in PDM's plant, 30 percent upon completion

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

of erection, and 10 percent upon completion of testing, or within 30 days after the tank had been made ready for testing. The original terms were not satisfactory to Brookhaven's president, Irving Betke, and were subsequently changed. The altered payment term provided that 100% of the contract price was due and payable within 30 days after the tank had been tested and accepted. The altered proposal was signed and accepted by Brookhaven on November 26, 1968.

Sometime during the following month Norman Knuttel, PDM's district manager who had prepared and signed the original and revised proposals, talked to a representative of the Arbanas Construction Company which company had contracted with Brookhaven for the construction of the tank foundation. Knuttel was informed that Brookhaven had received a loan from Diversified Finance Corporation. Although this information as to the receipt of the loan was incorrect, Brookhaven had negotiated with Diversified for a loan for the purpose of the construction which negotiations continued into the following year. Under date of January 3, 1969, PDM's credit manager wrote Diversified with a copy to Betke which letter in part was as follows:

"[W]e hereby request a letter assuring that $175,000.00 for payment of the referenced project will be held in escrow and fully committed to payment to us upon completion of referenced elevated tank. "As a matter of good business we are holding this order in abeyance until receipt of such notification."

The contract contained no provision for escrow financing. Brookhaven, through Betke, took no action upon the receipt of the copy of the letter. Subsequently, after further correspondence and meetings, resulting. primarily from Brookhaven's not having secured a planned loan of $275,-

000.00 from Diversified Finance, PDM's credit manager sent an air mail, special delivery letter to Betke, dated March 19, 1969, which suggested that Betke "mail us your personal guarantee of payment of $175,000.00 as per the contract, to protect us in the interim between now and the time your loan is completed."

While the contract specified the payment of the amount mentioned no later than 30 days after completion of the tank, it was silent as to any reference to a personal guarantee by Betke. The letter concluded as follows:

"Upon receipt of such guarantee, we could immediately set in motion our shop fabrication which would result in earlier completion of your new tank.

"When your loan is completed we will still require a letter of instructions to be forwarded from you to your bank, or other financial institution which extends this loan, that $175,000.00 is to be held in escrow for disbursement only to Pittsburgh-Des Moines Steel Company in accordance with our contract."

The construction of the water tower was scheduled to begin on April 15, 1969. A crew had been scheduled for the site three months previously, and a crew was ready to appear there on April 15, 1969. As matters transpired, however, the tank was never installed at Brookhaven's site. On March 31, 1969, Betke sent PDM Comptroller Harry Kelly his personal financial statement, but he did not send PDM his personal guarantee for the loan. After Betke failed to provide his personal guarantee of the $175,-000.00 contract price, PDM took no further steps toward performance.[1] On April 22, 1969, Kelley, PDM Secretary-Treasurer Tom Morris, PDM Sales Manager Dwight Long, and Betke attended a meeting on the Brookhaven premises. Although the record reveals somewhat inconsistent versions of

---

[1.] The record indicates that as of April 22, 1969, the foundation, the construction of which was the obligation of Brookhaven, had been completed and two-thirds of the required tankage parts, which were the obligation of PDM, had been fabricated. However, it is also noted that as late as March 19, 1969, PDM had written

Betke that upon the receipt of the guarantee, the shop could immediately set in motion fabrication. It is not clear whether PDM did anything to dispel the clear inference to Betke that there would be no fabrication, or at least further fabrication, until the guarantee had been received.

the details of that meeting, it appears that Morris told Betke that PDM would complete the fabrication of the tank and deliver it to the job site within a matter of weeks but that Betke replied that he had no need for the tank until the following year.

Further efforts to implement the contract broke down completely after April 22, 1969. Brookhaven's installation of the reinforced concrete foundation for the tank had been accomplished at a cost to it of $18,895. Subsequent to the March meeting, Brookhaven purchased additional land and developed two wells which provided an adequate water supply. Brookhaven later sold all its assets, including both equipment and land, to the City of Darien. At the trial of the damages issue, an expert in demolition testified that the cost of removing the reinforced concrete foundation would be about $7,000. On the basis of this testimony, which was proffered upon the legal theory that Brookhaven had a right to recover the cost of the removal, the district court found that the total amount of damages sustained by Brookhaven was the sum of $25,895.00 and entered judgment in its favor for that amount.

## I. The Grant of Judgment Notwithstanding the Verdict

### A. Compliance with Rule 50(b)

The initial issue in this appeal is whether the district court erred in granting judgment notwithstanding the verdict in favor of Brookhaven. Citing appropriate authority, appellant PDM contends that a motion for directed verdict is a prerequisite to a motion for judgment n. o. v. and that the district court had no judicial power to enter judgment for Brookhaven, inasmuch as the latter had not renewed its motion for a

directed verdict at the close of all the evidence nor had it moved for a directed verdict as to its counter-claim.[2] Brookhaven argues that matters not raised below cannot be urged for the first time on appeal and that sound policy analysis should induce this court to prevent PDM from gaining a "tactical victor[y] at the expense of substantive interests." 5A Moore, Federal Practice ¶ 50.08 at 2359 (2d ed. 1975).

We note that PDM, prior to raising on this appeal the question of compliance with Fed.R.Civ.P. 50(b), filed eight written memoranda, including one to this court in an earlier effort to gain appellate review, without any focus on the question of the lack of judicial power in the district court to grant judgment n.o.v. The only reference in the record which has come to our attention regarding the failure of Brookhaven to file motions for directed verdict at the close of all of the evidence is the statement in PDM's reply to Brookhaven's post-trial motion in which it was asserted, "It is significant that at the end of all of the evidence the defendant did not again move for a directed verdict in its favor." In the context of the reply in which PDM referred to the evidence supporting a verdict in its favor, it appears clear to us that PDM was doing nothing more than contending that Brookhaven obviously regarded as fruitless any effort at renewing its motion, having "fully argued its motion for a directed verdict [at the close of the plaintiff's evidence], which the court denied." The passing reference to the failure is no substitute for bringing to the attention of the trial court the claim that it lacked the power to entertain the motion. There would have been no necessity for discussing the merits of the motion in the reply except upon an arguendo basis. The plain fact is that there was

**2.** Rule 50(b), Fed.R.Civ.P., provides in pertinent part:

"Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; . . . ."

PDM relies in its briefs upon *Starling v. Gulf Life Insurance Company,* 382 F.2d 701 (5th Cir.

1967), and *Beebe v. Highland Tank and Manufacturing Company,* 373 F.2d 886 (3d Cir. 1967). Subsequent to the submission of briefs in this appeal, the Eighth Circuit in *Cargill, Incorporated v. Weston,* 520 F.2d 669 (8th Cir. 1975), held that a motion for a directed verdict was a requisite to a motion for judgment notwithstanding the verdict. In that case, however, *the defendant had also failed to move for judgment notwithstanding the verdict.*

exhibited no awareness by any of the participants in this case at the trial court level, including the judge, that there had been any violation of Rule 50(b).

■ We do not view favorably the raising of an issue, particularly a technical one, for the first time on appeal. *Moran v. Raymond Corp.,* 484 F.2d 1008, 1011 (7th Cir. 1973), *cert. denied,* 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974). We have no reason for thinking that as a matter of fact there was a conscious waiver for tactical or other reasons by PDM. As we have already indicated, there was, if anything, a lack of awareness of the possibility of a violation of the rule. Even though non-jurisdictional procedural rules would ordinarily be of the type that would be waived on appeal as a matter of law by not being brought to the attention of the trial court, there is an underlying rationale or reason for compliance with the requirement that the motion for directed verdict be filed at the end of all of the evidence if the right to move for judgment n.o.v. is to be permitted.

"One reason why a motion for a directed verdict is a prerequisite to a motion for judgment notwithstanding a verdict is stated by Judge Gardener in *Mutual Ben. Health & Accident Ass'n v. Thomas,* [123 F.2d 353, 355 (8th Cir. 1941)] as follows:

'It is only where a litigant has made motion for a directed verdict that he may ask the court to enter judgment non obstante veredicto. It is only in this manner that the question may be reexamined as a question of law. To ask the court to enter a judgment, contrary to a general verdict of the jury where no motion for a directed verdict has been interposed, is simply to ask the court to re-examine the facts already tried by the jury, and this the court may not do without violating the Seventh Amendment.'

"There is a better reason for establishing the motion for directed verdict as a condition precedent to a motion for judgment n.o.v. This is to avoid making a trap of the latter motion. At the time that a motion for directed verdict is permitted, it remains possible for the party against whom the motion is directed to cure the defects in proof that might otherwise preclude him from taking the case to the jury. A motion for judgment n.o.v., without prior notice of alleged deficiencies of proof, comes too late for the possibility of cure except by way of a complete new trial. The requirement of the motion for directed verdict is thus in keeping with the spirit of the rules to avoid tactical victories at the expense of substantive interests." 5A Moore, Federal Practice ¶ 50.08, at 2358–59 (2d ed. 1975).

■ The importance of the condition precedent aspect of the requirement causes us to be reluctant to say that we should rest a decision solely on waiver following the failure to raise the issue in the district court. On the other hand, we are not unmindful that the Federal Rules of Civil Procedure were not designed to codify the rigid and elaborate, and often stultifying, rules of common law procedure. The federal rules should have flexibility, and even though as counsel for Brookhaven conceded during oral argument here, "the rules are meant to be observed," their application in any case should be examined in the light of the accomplishment of their particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for the truth. In that framework and mindful that this court has previously indicated that the determination of what constitutes a motion for directed verdict should be liberally viewed, *Moran, supra* at 1014, we turn to the record in this case to determine whether we pass, the doorstep of this appeal.[3]

■ At the conclusion of the plaintiff's evidence, the trial court indicated that it

---

**3.** See also *Jack Cole Co. v. Hudson,* 409 F.2d 188 (5th Cir. 1969), and *Roberts v. Pierce,* 398 F.2d 954 (5th Cir. 1968).

was "strongly inclined to grant the motion." The court, however, continued with the case, in part because of the counterclaim which would have to go to the jury and because the judge believed that "it is always better if a case can be concluded with a jury when there are serious questions of law involved."

At the close of all the evidence, PDM filed separate motions for directed verdict, one on its complaint, the other for a directed verdict against Brookhaven on the counter-complaint. The court indicated its disagreement with PDM's stated grounds, denied the motions, and stated that it had "already indicated that the motion for a directed verdict on the complaint should be denied on behalf of the defendant. The situation hasn't changed any since that time."

It appears obvious to us, and it must have appeared equally so to counsel for Brookhaven, that the court had firmly taken the position, notwithstanding any leaning which the judge may have had, that the jury was going to have the first opportunity to decide the case. Renewing the motion or moving for a directed verdict on the counterclaim which hinged upon the validity of Brookhaven's defense, would have been nothing more than a ritualistic mouthing and nugacious obeisance to the form, but not the spirit, of the rule.

That the trial court judge continued to entertain a lingering doubt as to whether the case should not be taken from the jury is found in a later portion of the record which includes a lengthy conference on the instructions to be submitted to the jury. In part, this resulted from the system used in putting together the pretrial order, which the trial judge (who was not responsible for it) found "very confusing." As defendant and counter-plaintiff, Brookhaven attempted to secure instructions embodying its theory of the case. Shortly after the denial of PDM's motions for directed verdicts, and the alleged noncompliance with Rule 50(b), the following colloquy took place:

"The Court: Well, again, I think this gets into Section 2–609 *which, if the*

*plaintiff has any issue to go to the jury on,* would be under that section.

Mr. Mix [Defendant's Counsel]: This is my instruction, your Honor.

The Court: I understand that. But what you are doing is preempting their argument that Section 2–609 is involved in this case. I am not sure if that—*if we are going to the jury at all*—that should be preempted.

I have some that will cover this situation. For the moment, at least, I will pass . . . Defendant's No. 1.

This is in effect a directed verdict, Mr. Mix, Defendant's No. 1.

Mr. Boundas [Plaintiff's Counsel]: And we object to that, your Honor.

Mr. Mix: I think we are entitled to it, your Honor.

The Court: *If we are going to the jury at all,* I don't think it is proper to give them a preemptory instruction that is in effect a directed verdict." (Emphasis added.)

At the time of this conference it is apparent that all of the participants recognized that Brookhaven's proposed instruction was, in effect, a motion for directed verdict.

Upon the facts of this case, notwithstanding that the better, and certainly the safer, procedure for counsel would be to adhere to the letter of the rule, we hold that there was sufficient predicate for the court to entertain the motion for judgment notwithstanding the verdict.

**B.  Existence of Fact Issues Precluding Judgment n. o. v.**

PDM argues that even if Brookhaven's motion for judgment n. o. v. was properly the subject of consideration by the court, there was error in granting the motion because the evidence created issues of fact to be determined by the jury, and its verdict was therefore conclusive. Before discussing the error urged by PDM, we advert briefly to the legal standard applicable to the grant of judgment n. o. v.

This court has previously held that the proper standard for direction of verdicts

and entry of judgment in diversity cases is the state standard. *Etling v. Sander,* 447 F.2d 593 (7th Cir. 1971). The strict Illinois standard is set forth by the Illinois Supreme Court in *Pedrick v. Peoria & E. R. R. Co.,* 37 Ill.2d 494, 510, 229 N.E.2d 504, 513 (1967). Under that case, a defendant is entitled to a directed verdict or a judgment notwithstanding the verdict when all the evidence, viewed in its aspects most favorable to the plaintiff so overwhelmingly favors the defendant that no contrary verdict based on the evidence could ever stand.

We are satisfied from our examination of the record that the district court entered judgment for Brookhaven on the ground that applicable law required judgment in favor of the defendant. In our further examination we will direct our attention to whether judgment n. o. v. was required by applicable law irrespective of whether this law was exactly as defined by the district court.

## II.  Claimed Bases of Liability

Under the contract as executed, into which prior negotiations had been merged, Brookhaven's performance of its principal obligation to pay the purchase price was not due until after the completion of construction. Nevertheless within a period of time shortly more than one month after the contract became effective, PDM was requesting that a prospective lender of the funds to Brookhaven should hold the entire $175,-000.00 in escrow. This was not a request that a lending institution give a letter of intent or otherwise confirm that it would make a particular loan when the payment became due after completion of construction. Instead the letter explicitly would, if honored, have required Brookhaven to complete all necessary loan papers and to arrange for the consummation of the loan, the proceeds of which would then be held by Diversified for some months until the work was completed. It is no answer to say that perhaps Brookhaven could have arranged

for the escrowed fund to have been invested in some safe, readily liquidable form which might offset in part at least the loss to Brookhaven resulting from having to pay interest on money already borrowed. PDM having purported to agree not to ask for progress payments during the course of construction, more than half of which would have been due before the first act took place by PDM on the construction site, it now was substituting another requirement clearly beyond any requirement contemplated in the contract which would not have put the purchase price in hand but would nevertheless have it where it could be available for the picking at the appropriate time. The contract is silent as to any right of PDM to insist Brookhaven provide any such guarantee during the period before completion of construction. Further, PDM made it quite clear that it was "holding this order in abeyance until receipt of" notification that the money was being so held. We find no basis for an inference that at this time Brookhaven was not ready, willing and able to perform its obligations under the contract nor that it would not be able to pay when it owed. The fact that there had been negotiations for a loan of money that would not be needed for some months, which negotiations had not come to fruition, does not support such an inference. Two months after the letter to Diversified, PDM reaffirmed its lack of retreat from the position of requiring assurance that the money would be forthcoming.

PDM argues that its position was in accordance with Section 2–609 of the Uniform Commercial Code (UCC) enacted into law in Illinois as Ill.Rev.Stat. ch. 26, sec. 2–609. That section which "creates a new contract enforcement procedure for the situation where one party feels insecure as to the other's performance"[4] reads in pertinent portion as follows:

"Right to Adequate Assurance of Performance. (1) A contract for sale imposes an obligation on each party that the

4. Anderson, *Repudiation of a Contract Under the Uniform Commercial Code,* 14 DePaul L.Rev. 1, 3 (1964).

other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

"(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

\*　　\*　　\*　　\*　　\*　　\*

"(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

■ There appears to be considerable doubt that a seller was entitled to this protection prior to the adoption of the UCC;[5] therefore before deciding that question we address ourselves to whether the UCC is applicable to the present transaction. That determination is primarily dependent upon whether the one-million gallon water tank constitutes "goods" within the meaning of the UCC which defines the term in § 2–105(1) as:

" 'Goods' means all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."

It is apparent that the district court was not prepared to rule that § 2–609 was inapplicable to the transaction at the time of

the jury charge as that body was given an instruction substantially embodying the language of the pertinent parts of the statute. This view of the law was not held, however, at the time of the ruling on motion for judgment n. o. v.:

"If plaintiff was selling anything to defendant, it was at most the fabricated parts of the water tank, but the controversy involves the subsequent terms of the contract. The tenor of the Uniform Commercial Code and the statutes which it replaced are inapplicable to a construction contract."

The Court, however, in its decision and order added the alternative basis that the result would have been the same even if § 2–609 were applicable, observing, *inter alia*, as follows:

"There is no evidence in the record that defendant's finances or ability to pay changed in any way after the contract was accepted on November 26, 1968 or that plaintiff had any objective grounds to feel insecure. Plaintiff began inquiring about defendant's financing soon after the contract was signed, but no adverse information was found. Ultimately plaintiff refused to erect the fabricated parts of the tank, but it showed no justification for this."

The district court apparently regarded the matter as being the not entirely unfamiliar situation of a corporate credit department not viewing a contract of sale with the same *joie de vivre* as did the sales department; but the court thought that the sales department had legally committed the firm and that the credit department had gone beyond the grounds for actuating the assurance provided by the statute.

The word "goods" is no newcomer to the law. More than a century ago the Supreme Judicial Court of New Hampshire in holding that the price of a movable building on

**5.** In *Note, A Right to Adequate Assurance of Performance in All Transactions: U.C.C. § 2–609 Beyond Sales of Goods,* 48 S.Cal.L.Rev. 1358, 1375–87 (1975), the author supports a case for either judicial expansion or legislative imposition of the § 2–609 provisions as to contracts not covered by the UCC. The Note, however, concedes that other than a dictum in *Berry's Sons Co. v. Monark Gasoline & Oil Co.,* 32 F.2d 74 (8th Cir. 1929), no subsequent case has held that there would be an implied term of the contract if the parties have not expressly included such a provision.

the land of another could be recovered in an action for goods sold and delivered, observed in *Keyser v. District Number 8,* 35 N.H. 477, 483–84 (1857):

> "The word *'goods,'* as a technical term of the law, is *nomen generalissimum,* and has a very extensive meaning. In a will, where there is nothing to restrain its operation, it includes all the personal estate of the testator. 1 Jarman on Wills 692. In a strict sense, as the word is understood in the construction of penal statutes, it is limited to movables belonging to the property of some person, which have an intrinsic value, and does not include securities, which are not valuable in themselves, but merely represent value. *United States v. Moulton* [27 Fed.Cas.No. 15,827, p. 11], 5 Mason 544.

> "This building was movable property, belonging to the plaintiff and the other proprietors, and falls within the strict common law definition of the term 'goods,' as given in the *United States v. Moulton.* In construing agreements the application of the term is often restricted; but in its legal sense, as answering to the law term 'Biens,' it includes all tangible personal property, even living animals."

Nor is the word a stranger to other areas of the law. In *Writz v. Mayer Construction Co.,* 291 F.Supp. 514 (D.N.J.1968), the court held that building supplies were goods within the meaning of the Fair Labor Standards Act. In *St. Joseph Hydraulic Co. v. Wilson,* 133 Ind. 465, 33 N.E. 113( 1892), a purported mortgage lien was involved given by the owner of a paper mill which was located on land of mortgagor. In such a case, the court held, the mortgage itself would amount to a constructive separation of the mill from the real estate and the mill so separated constituted "goods" within the meaning of the Indiana chattel mortgage statute.

■■■ We find ample support in the cases arising under the UCC itself that the scope of coverage of "goods" is not to be given a narrow construction but instead should be viewed as being broad in scope so as to carry out the underlying purpose of the Code of achieving uniformity in commercial transactions.[6] The Code, which by its own terms, § 1–102, is to be liberally construed, should be uniformly applied to achieve its purposes. We believe Illinois would so decide. In the present case, while the finished tank was scarcely one to be taken off the shelf, we are unaware of any authority that specially manufactured small dies should be goods and a very large tank not so classified. In the words of the UCC this was a "movable" "thing" "specially manufactured." That which PDM agreed to sell and Brookhaven agreed to buy was not services but goods as defined in the UCC.

That determination, however, is not dispositive of the ultimate issue. The question remaining is whether PDM's actions subsequent to the execution of the contract were within the protection provided by § 2–609. We hold that they were not.

■■■ The performance to which PDM was entitled was the full payment of the purchase price within a specified time after

---

6. See, for example *Pineau v. White,* 135 A.2d 716 (N.H.1957), involving a contract for the installation of a furnace; *Apeco Corporation v. Bishop Mobile Homes, Inc.,* 506 S.W.2d 711 (Tex.Civ.App.1974), sale of a mobile home; *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir. 1974), a contract for the seller to install bowling equipment in a bowling alley. But, compare, *Schenectady Steel Co., Inc. v. Bruno Trimpoli General Construction Co., Inc.,* 43 App.Div.2d 234, 350 N.Y.S.2d 920 (1974). In *Bonebrake,* the court indicated that the rendering of service in connection with a sale did not remove it from the coverage of the UCC and enunciated a test, which we approve, for determining the inclusion or exclusion of transactions in goods covered by nondivisible mixed contracts (*i. e.,* goods and services) was whether their predominant factor, their thrust, their purpose, reasonably stated, was the rendition of service with goods incidentally involved, or a sale and purchase of "movable" "things," with labor or services incidentally involved.

Nor does the fact that the goods are not in existence at the time of the execution of the contract change their status as goods. Thus, in *Reininger v. Eldon Mfg. Co.* 114 Cal.App.2d 240, 250 P.2d 4 (Cal.Ct.App.1952), the contract was for the manufacture of dies to be used by the buyer for its own manufacturing processes.

the completion of the tank. While we have a substantial question as to whether PDM made a written demand as required by the statute, in keeping with our concept that the UCC should be liberally construed, we do not desire to rest our decision on a formalistic approach. Letters were written which conveyed what PDM wanted done before they would pursue their obligations under the contract. The fundamental problem is that these letters, if they be deemed to be in the nature of a demand, demanded more than that to which PDM was entitled and the demand was not founded upon what in our opinion was an actuating basis for the statute's applicability.

We do not construe § 2–609 as being a vehicle without more for an implied term being inserted in a contract when a substantially equivalent term was expressly waived in the contract. The something more to trigger applicability of the statute is that the expectation of due performance on the part of the other party entertained at contracting time no longer exists because of "reasonable grounds for insecurity" arising. We find that PDM's actions in demanding either the escrowing of the purchase price or a personal guarantee lacked the necessary predicate of reasonable grounds for insecurity having arisen. The contract negates the existence of any basis for insecurity at the time of the contract when PDM was willing to wait 30 days beyond completion for payment. The fact that Brookhaven had not completed its loan negotiations does not constitute reasonable grounds for insecurity when the money in question was not to be needed for some months. Reasonable business men prefer in the absence of some compulsive reason not to commence paying interest on borrowed money until the time for the use for that money is at hand. The credit manager's January letter that the order was being held in abeyance until receipt of notification of escrowing was based upon a "matter of good business," but not upon any change of condition bearing upon Brookhaven's ability to discharge its payment obligation under the contract. With regard to the later request for a personal guarantee, it is not uncommon for an individual to decline assuming obligations of a corporation in which he is a shareholder. Indeed, the use of the corporate device frequently has as a principal purpose the limitation on individual exposure to liability. If an unfavorable risk in dealing with a corporation exists at contracting time, good business judgment may well indicate that an assurance be secured before contracting that there will be individual shareholder backup. None of this occurred and the record is silent as to any reasonable grounds for insecurity arising thereafter.

It is true that one officer of PDM testified that the company did not send a crew because we questioned whether we might be paid for the project "at that time." Some more objective factual basis than a subjective questioning, in our opinion, is needed to demonstrate reasonable grounds for insecurity. Likewise, another PDM officer testified that it was the company's normal and regular procedure not to erect a structure "until we have reason to believe that the funds to pay for the structure *are* available." The time of which he was speaking was a time at which there was no contractual requirement that the funds be available. The funds were only required to be available after completion of installation. He testified further that the normal procedure was not to erect until satisfactory arrangements were made. None of this subjectively normal procedure was imposed as a provision in the contract which in view of the withdrawn provision for progress payments showed reasonably to Brookhaven that not only payment, but arrangements for payment, would not be necessary until after completion.

We, of course, would not deprive PDM of resort to § 2–609 if there had been a demonstration that reasonable grounds for insecurity had arisen. The proof in that respect was lacking. The comptroller and supervisor of PDM's credit department testified that he had access to all of the credit information that the company had regarding Brookhaven, that he had reviewed that information, and that he was unaware of

any change in the financial condition of Brookhaven between November of 1968 and the end of 1969. Finally, we note that despite the professed subjective questioning in April as to whether PDM might be paid, the credit manager as early as January had said that the job would be held in abeyance until arrangements had been made for escrowing and a month after the questioning, the questioning officer had offered to proceed with construction in exchange for an interest in Brookhaven, an unlikely course if Brookhaven were financially in a questionable condition. There was also testimony with the same inference that PDM was not fearful of Brookhaven's financial stability or ability to pay in connection with PDM lending to Brookhaven the amount involved at an interest rate of $9\frac{1}{2}\%$ which rate was then unacceptable to Brookhaven. If the buyer was unable to pay for the performance of the contract, it is difficult to see that it was better able to pay a promissory note. We do not fault Brookhaven for its rejection of various proposals advanced by PDM each of which amounted to a rewriting of the contract in the absence of a proper § 2–609 basis. The fact, if it were a fact, that Brookhaven may not have had a large amount of cash lying in the bank in a checking account, not an unusual situation for a real estate developer, does not support the belief that it, as a company with substantial assets, would fail to meet its obligations as they fell due. Section 2–609 is a protective device when reasonable grounds for insecurity arise; it is not a pen for rewriting a contract in the absence of those reasonable grounds having arisen, particularly when the proposed rewriting involves the very factors which had been waived by the one now attempting to wield the pen. The situation is made no more persuasive for PDM when it is recalled that that company was the original scrivener.

Brookhaven's request to put off the contract for a year clearly came after PDM's repudiation of the contract and was indicative of nothing more than that Brookhaven was willing to undertake a new arrangement with PDM a year hence. Pursuant to § 2–610 of the UCC,[7] Brookhaven was entitled to suspend its own performance by virtue of the anticipatory repudiation by PDM and to resort to available remedies, including damages pursuant to § 2–711 of the·Code.[8]

### III. Claimed Error in Assessment of Damages

PDM's claim of error directed to the district court's assessment of damages rests upon the contention that the diminution-of-value rule was applicable. Brookhaven concedes that it never removed the reinforced concrete foundation it had installed, and PDM concedes that it takes no issue with the findings of the magistrate to

---

7. "§ 2–610. Anticipatory Repudiation. When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

  (a) for a commercially reasonable time await performance by the repudiating party; or

  (b) resort to any remedy for breach (Section 2–703 or Section 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

  (c) in either case suspend his own performance·or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2–704)."

8. We have not attempted to determine whether the parties were merchants within the meaning of subsection 2 of § 2–609 in which case the determination of the reasonableness of grounds for insecurity would be in accordance with commercial standards. There being no evidence as to what commercial standards might be applicable, we have attempted to construe the controlling phrase in accordance with what appears to us to be its plain meaning.

Further, we find no merit in PDM's argument that even if its January action could be construed as an anticipatory repudiation under § 2–610, its subsequent actions demonstrated a retraction of the anticipatory repudiation pursuant to § 2–611. That section requires a clear indication to the aggrieved party "that the repudiating party intends to perform." PDM only made it clear throughout that it intended to perform if Brookhaven gave assurances not required of it legally or contractually.

whom the matter had been referred for preliminary hearing as to the $7,000 cost for restoring the premises to their original condition. Our review of the record establishes that Brookhaven never produced evidence that the City of Darien made a specific reduction in its offering price due to the presence of the foundation.

Our resolution of the damages issue is hampered by the manner in which the appellant has briefed this question. Its basic argument is that Brookhaven had to prove that it made out-of-pocket expenditures for the removal of the foundation, and it cites *Bowes v. Saks & Co.*, 397 F.2d 113 (7th Cir. 1968). We note that PDM presented a number of supposedly relevant Illinois cases to the magistrate, but that it has not referred to those cases in its argument to this court. See Fed.R.App.P. 28(a)(4).

We are not persuaded that appellant's reliance on *Bowes* establishes any error in the proceedings below. That case did not deal with the breach of a contract for sale, service, or construction. The precise dispute in that litigation focused on the lessee's breach of a clause in a lease. The lessee had covenanted to deliver the demised premises in good order, including restoration of the said premises as near to its original condition as practical. This court affirmed the district court, but it did so by adopting the opinion of the lower court, which was set forth in an appendix. A close reading of the adopted opinion reveals that the trial court expressly noted, at 397 F.2d 117 n. 4, that no Illinois authority suggested that the diminution-of-value rule was controlling. The trial court did concede that if the diminution rule were controlling, "the cost of repair rule cannot even be considered in the present case." *Id.*

The fact that the adopted opinion in *Bowes* expressly noted that there was some question about the controlling rule in Illinois establishes to our satisfaction that *Bowes* does not rule on the question raised in this appeal. There is no question but that the Illinois rule of damages applies in the present litigation. We think there was sufficient credible evidence establishing

Brookhaven's damages in the amount of $25,895.00. In view of the fact that PDM has not cited any cases from the Illinois courts that establish a different rule of damages applicable to the facts of this contract dispute, we find no error below.

For the reasons hereinbefore set out the judgment of the district court is

Affirmed.

CUMMINGS, Circuit Judge (concurring).

Although I agree with the result reached in the majority opinion, I differ with the reasoning. Reasonable men could certainly conclude that PDM had legitimate grounds to question Brookhaven's ability to pay for the water tank. When the contract was signed, the parties understood that Brookhaven would obtain a loan to help pay for the project. When the loan failed to materialize, a prudent businessman would have "reasonable grounds for insecurity." I disagree that there must be a fundamental change in the financial position of the buyer before the seller can invoke the protection of UCC § 2–609. Rather, I believe that the Section was designed to cover instances where an underlying condition of the contract, even if not expressly incorporated into the written document, fails to occur. See Comment 3 to UCC § 2–609. Whether, in a specific case, the breach of the condition gives a party "reasonable grounds for insecurity" is a question of fact for the jury.

UCC § 2–609, however, does not give the alarmed party a right to redraft the contract. Whether the party invoking that provision is merely requesting an assurance that performance will be forthcoming or whether he is attempting to alter the contract is a mixed question of law and fact, depending in part upon the court's interpretation of the obligations imposed on the parties. In this case, PDM would have been assured only if significant changes in the contract were made, either by receiving Betke's personal guarantee, by attaining escrow financing or by purchasing an interest in Brookhaven. The district court could properly conclude as a matter of law that

584

these requests by PDM demanded more than a commercially "adequate assurance of due performance."