**MISSOURI BAPTIST HOSPITAL**

v.

**The UNITED STATES.**

No. 801–71.

United States Court of Claims.

April 20, 1977.

Jack Rephan, Washington D.C., atty. of record, for plaintiff. Danzansky, Dickey, Tydings, Quint & Gordon, Washington, D.C., and Robert W. Copeland, Clayton, Mo., of counsel.

John E. Lindskold, Washington, D.C., with whom was Asst. Atty. Gen., Peter R. Taft, Washington, D.C., for defendant.

Before NICHOLS, KUNZIG and BEN-NETT, Judges.

## ON PLAINTIFF'S AND DEFENDANT'S EXCEPTIONS TO TRIAL JUDGE's OPINION

KUNZIG, Judge:

This suit seeks to recover damages emanating from a lease by plaintiff, Missouri Baptist Hospital (Missouri Baptist) to defendant, of certain real property located in the City of St. Louis, Missouri. This case was heard before Trial Judge Thomas J. Lydon, who has submitted a recommended decision and conclusion of law, proposing a recovery for Missouri Baptist of $120,292, based on the Government's failure to make repairs to the building at the termination of the lease. Recovery was denied to the Government for its two asserted counterclaims. A belated claim by the plaintiff was also denied. Both parties excepted to the trial judge's opinion.

After briefing and oral argument, it is determined that we cannot adopt the full decision recommended by the trial judge, as we find the damages to have been reached under an erroneous legal standard. We hold that where the cost of repair of leased premises exceeds the diminution of the leasehold's fair market value, it is error

to apply as the measure of damages owed the lessor, the "cost of repair" standard rather than the diminution in value standard. We further hold that plaintiff had the burden of proof in this case to show not only the cost of repairs, but also the diminution in fair market value, so as adequately to prove his true damages. Plaintiff failed in this regard, and cannot recover.

That portion of the trial judge's decision denying defendant's counterclaims and denying plaintiff's belated claim is adopted by the court and included with this opinion, *infra*.[1]

In 1958, prior to the execution of the lease in question, plaintiff operated a hospital in the downtown area of the City of St. Louis. Because of the declining condition of the neighborhood, the age of the building, and the expense of renovation, plaintiff built a new hospital in the suburbs. In early 1965, plaintiff began to phase out the old hospital. By December 31, 1965, the old hospital was vacated and remained vacant until July 1, 1966. Plaintiff was unsuccessful in attempting to sell the property.

In October 1965, the Job Corps, Office of Economic Opportunity (OEO) began studies to determine the suitability of the old hospital as a site for a Job Corps Center for Women. Although the building had its shortcomings, in June 1966, OEO finally decided to utilize the old hospital. OEO entered into a cost-plus type of contract with Delta Corporation (Delta) to operate a Women's Job Corps Center. In June 1966, Delta leased the old hospital from plaintiff at an annual rental of $125,000 for a term of 38 months, ending August 31, 1969. Delta spent over $600,000 in repairing and rehabilitating the building. During the period the Center was operating, the maintenance and repair costs were extremely high—between $75,000 and $80,000 per year because of the age of the building.

The Job Corps Center for Women was closed in June 1969. Delta assigned the lease to the Department of Labor (Labor) which had absorbed this portion of OEO. Plaintiff and Labor amended the lease to provide for a month-to-month tenancy, commencing September 1, 1969, at a reduced rental. The building was used for temporary storage of Job Corps personal property.

In early January 1970, Labor decided to terminate the lease and vacate the building by January 31, 1970. Some areas of the building were not adequately maintained and repaired and, therefore, at the termination of the lease, *the building was not delivered to plaintiff in good condition, ordinary wear and tear excepted, as required by the lease provisions.*

Plaintiff brought this action to recover damages arising from defendant's failure to deliver the premises in good condition, ordinary wear and tear excepted, at the termination of the lease. Plaintiff alleged in the petition that defendant's breach of the lease damaged plaintiff's property "as a result of which the *value* of such property *was diminished* by the sum of One Million Dollars * * *" (Petition, p. 9) (emphasis added).

The trial judge, applying the *cost of repair as the measure* of damages, held that plaintiff was entitled to recover $120,292.[2]

1. The court adopts the trial judge's findings of fact, as modified, which are necessary for our determination. They are set forth in his report filed March 8, 1976, and are not printed herein since all necessary facts are contained in this opinion.

2. At this point, the components of the trial judge's recommended award should be clarified since the briefs and argument evidenced some confusion as to the actual figures. Part of the hospital was known as Wing A. As to Wing A, the trial judge found that there were no reliable damage estimates submitted by the parties. The plaintiff had sought to recover the fair market value of Wing A as damages. The trial judge determined that $17,868 was the proper measure of damages as attributed to Wing A, a figure falling far short of plaintiff's requested relief.

The $17,868 figure, combined with $102,424 (50% of the finding of $204,848 cost of repair figure for the rest of the hospital) totals $120,-292, which is the amount of the recommended recovery.

Since we hold that in this case the entire award, if any, should be determined by a diminution in fair market value measurement, the detailed particulars of the trial judge's recommended award need not be further considered.

In reaching this award, the trial judge stated that plaintiff's witness did not take into consideration in his repair cost estimate any allowance for reasonable wear and tear arising from the use of the building as contemplated by the lease. Consequently, the repair estimate figure was reduced by fifty percent (50%) as an allowance for reasonable wear and tear. Plaintiff contends that the finding that plaintiff's witness failed to take wear and tear into consideration was contrary to the evidence in the record. Alternatively, plaintiff urges that even if the witness did *not* take wear and tear into consideration, the use of a 50% reduction factor was improper.

From our analysis of the record, it is conceivable that plaintiff's exceptions contain certain merit. However, since we hold for the Government on the issue of burden of proof, and that in this case, diminution of value is the proper measure of damages, we need not reach plaintiff's exceptions.

This brings us to defendant's exceptions. The Government maintains that the proper measure of damages in this case is not the "cost of repair," but diminution in the fair market value caused by the acts of the defendant.

The Government further argues that plaintiff has failed to establish by a preponderance of the evidence that the fair market value of the leasehold property was diminished by the Government's failure to abide by the terms of the lease. The Government introduced expert testimony that the property had no value on January 31, 1970.[3] Since the defendant also argues a total failure of proof by the plaintiff of value of the property on June 24, 1966, defendant alleges that plaintiff cannot show it actually suffered damage by virtue of defendant's breach of the lease.[4]

The nature of the Government's two counterclaims and the plaintiff's belated additional claim are adequately explained and dealt with by the trial judge, and that portion of his opinion dealing with these issues is printed after the Government's principle exceptions are reviewed in full.

Preliminarily, the Government has conceded that it breached, in part, various provisions of the lease.[5] We need not spell out

3. For the purposes of clarity, we shall henceforth call January 31, 1970 (the day the lease was terminated) "day out." June 24, 1966 (the day the parties entered into the lease agreement) will be termed "day in."

4. As we agree with these exceptions, we need not explore the Government's alternative argument pressed at oral argument, that the plaintiff's award be cut by $37,500. The trial judge found that the poor condition of the building was due in part to vandalism and causes other than defendant's actions. This finding was not excepted to by the plaintiff. The Government urges that before the total award of $204,848 was reduced by 50% to reflect normal wear and tear, the trial judge should have reduced the figure by $75,000 to reflect such outside causes. Were this to be done, plaintiff's "cost of repair" recovery would be cut by $37,500.

5. Specifically, the following paragraphs of the lease agreement were relied on by Missouri Baptist.

XI.
FURNISHINGS

* * * Lessee agrees to return all light fixtures, permanent installations of the building, or any fixtures or equipment permanently attached to the building and constituting a part of the realty thereof, or any air conditioning equipment, or air conditioners, at the termination of this lease, subject to wear and tear caused by normal usage of such furnishings and fixtures with no obligation to restore any furnishings or fixtures to their condition at the inception of this lease, except for such items as may have been damaged or broken.

XII.
ALTERATIONS, IMPROVEMENTS AND FIXTURES

* * * * * *

Lessee may attach any fixtures or equipment to the leased premises which it deems necessary or desirable, at Lessee's own expense. At the termination of the lease, Lessee may remove any such fixtures, * * * or equipment if the removal of same does not deface, or damage the leased premises.

* * * * * *

XIII.
REPAIR AND MAINTENANCE

Lessee hereby accepts the premises in the condition they are in at the beginning of this lease and agrees to maintain both the exterior and interior of said premises in good, clean and sanitary condition and in good order and repair and at the termination of this lease, will deliver

in detail each of these infractions—suffice it to say that the Government failed to return the property to the lessor in the manner and condition prescribed by the lease.

The Government relies on cases such as *Bowes v. Saks & Co.*, 397 F.2d 113 (7th Cir. 1968); *Dodge Street Building Corp. v. United States*, 341 F.2d 641, 169 Ct.Cl. 496 (1965); *Spitzel v. United States*, 146 Ct.Cl. 399 (1959); *Realty Associates, Inc. v. United States*, 138 F.Supp. 875, 134 Ct.Cl. 167, (1956); and *Eaddy v. United States*, 139 F.Supp. 49, 134 Ct.Cl. 338 (1956) to support its contention that the measure of damages for breach of a covenant to return the leased premises to the lessor in its original condition, is not the cost of repair *where such cost exceeds the diminution in fair market value of the premises.*

Plaintiff strenuously urges that these cases concern cost of restoration clauses and not cost of repair clauses; that costs to restore are not the same as costs to repair premises; and that a contrary rule should apply in repair cases. We disagree, and hold for defendant except with regard to its two counterclaims, which we deny pursuant to the trial judge's opinion, *infra.*

## I.

■ The overall purpose of the aforementioned measure of damages rule, as we see it, is to avoid windfall recoveries. This was well stated in *Associated Stations, Inc. v. Cedars Realty & Development Corp.*, 454 F.2d 184, 188 (4th Cir. 1972).

> The object of damages in a contract case is to restore the plaintiff to the position he would have been in had the contract not been breached. (Footnote omitted.) The "cost of restoration" method is one convenient way of determining the amount of damages to be awarded the plaintiff where a breach had occurred. There are, however, certain situations where this method of computing damages does not restore the plaintiff

to the position he would have been in had the contract not been breached, but rather places him in a better position, thus providing him with a windfall. In those cases, courts have resorted to alternative methods of computing damages in order to insure that, as far as possible, the plaintiff neither loses nor benefits from the breach. * * *

The purpose of avoiding windfall recoveries is no less well served in a *cost of restoration* situation than in a *cost of repair* situation. A familiar example will illustrate. A broken $10 watch might take $30 worth of repair work to fix, whereas its diminution in value could at most be $10. A $30 recovery from an imaginary watch-lessee who caused the watch to break could inspire the plaintiff to discard the broken watch, purchase a new one for $10, and realize a windfall of $20.

We note that the authorities have in the past used *repair* and *restoration* interchangeably. In *Associated Stations, Inc. v. Cedars Realty & Development Corp., supra* at 186, n.3, for example, the terms of the lease clearly provide that the lessee would be responsible for the costs of repair. Yet in his opinion, Judge Winter speaks of "cost of restoration" as being subject to a ceiling set by "diminution in market value."

In *Bowes v. Saks & Company*, 397 F.2d 113, 116–17 (7th Cir. 1968), a restoration case, the court held that "cost of repairs" is a convenient way to quantify "costs of restoration" within the facts of that case. As such, it held the cost of repairs subject to diminution in market value. We quote at length from that opinion:

> In the ordinary lessor's suit for breach of a covenant to restore, the lessor is entitled to damages he actually suffers. Two rules are commonly applied to measure these damages:
>
> > 'A lessee who breaches a provision of the lease requiring him to make certain repairs or to deliver up the premises at

the leased premises to the Lessor in good condition, * * *, excepting only reasonable wear and tear arising from the use thereof under this agreement. * * *

### XIV.
### WASTE
Lessee agrees that it will not permit or suffer any waste to the premises; * * *

the termination of the lease in a certain condition is liable in damages for the reasonable cost of making such repairs or of putting the premises in the condition prescribed by the lease.' *Crystal Concrete Corp. v. Town of Braintree*, 309 Mass. 463, 470, 35 N.E.2d 672, 675 (1941).

This is the general rule. However, it is not an absolute rule.

'But the plaintiff is not to be put in a better position than it would have been if the defendant had performed the terms of the lease. The location and character of the demised premises must be considered; and the reasonable cost of repairs, in some instances, would furnish the proper measure of damages while, in other instances, the value of the premises may be such that the incurrence of expense for repairs would not be a reasonable, practical or economic method of dealing with the property. Such expense might greatly exceed any diminution of the fair market value of the land that was caused by the defendant's nonperformance of the provisions of the lease.' *Ibid.*

Cost of repairs is merely a convenient way to quantify the damage a lessor has suffered. Where the facts indicate that cost of repairs is unrelated to lessors' actual damage, the rule is not applied. *Pennsylvania Cement Co. v. Bradley Contracting Co.*, 11 F.2d 687, 688 (2d Cir. 1926) (L. Hand, J.).

'In an action for breach of contract, as opposed to a suit sounding in specific performance, the lessor is entitled only to the damages that were caused to the property by the failure to restore. Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages.' *Dodge Street Building Corp. v. United States*, 341 F.2d 641, 644, 169 Ct.Cl. 496 (1965).

If the 'cost of repair' rule will give lessors a greater benefit than could be gained from full performance, a different measure of damages must be applied to avoid injustice. *Peevyhouse v. Garland Coal & Mining Co.*, 382 P.2d 109, 113 (Okla.1963). *Accord, Giordano v. Brandywine Mushroom Corp.*, 32 Pa.Dist. & Co. R.2d 522, 525–26 (1963). *And see Realty Associates v. United States*, 138 F.Supp. 875, 134 Ct.Cl. 167 (1956).

Our purpose in showing the interrelationship between *cost of restoration* and the *cost of repair* is to show that plaintiff assuredly cannot be "taken by surprise" by our holding that cost of repair recoveries are limited by the diminution in fair market value ceiling. The issue was squarely before plaintiff at all stages of the trial, as was the line of cases we have cited.

Therefore, in spite of plaintiff's arguments to the contrary, we find no persuasive reason that repair costs should not be, as restoration costs are, subjected to a ceiling of the diminution in value.

The importance of this rule is accentuated by the peculiar facts in the case at bar. The trial judge found that the plaintiff's difficulty in ultimately selling or re-leasing the property after the Government's tenancy was due in part to factors other than the damage which is the subject of this suit.[6] Missouri Baptist was in a deteriorating area of St. Louis, and was continually subjected to acts of vandalism. If for the moment we assume that the value of the property was greatly diminished by these and other outside factors, then perhaps the diminution in value, if any, *due to the Government's breach* was comparatively small, accentuating the windfall nature of a "cost of repair" recovery.

We hold that repair costs are subjected to a ceiling. That ceiling is the diminution in fair market value attributable to defendant's breach.

---

**6.** See note 4, *supra.* Plaintiff did not except to this finding. *See* Rule 143(d).

## II.

The Government argues that at trial, plaintiff failed to prove, by a preponderance of the evidence, that the fair market value of the premises was diminished by the Government's failure to abide by the terms of the lease. The Government notes that it provided an expert witness at trial who testified that the fair market value of the premises on the "day in" (June 24, 1966) was zero. This same expert witness testified that the fair market value of the premises on the "day out" (January 31, 1970) was zero. Unrebutted, argues the Government, the zero evidence for both "day in" and "day out" leaves no room for any diminution in fair market value, so plaintiff's recovery should be zero.

The Government cites *Dodge Street Building Corp. v. United States*, 341 F.2d 641, 645, 169 Ct.Cl. 496, 501, (1965) to demonstrate that plaintiff failed in its burden at trial and should thereby be denied recovery:

> . . . it was incumbent upon plaintiff to establish by a preponderance of the evidence that the fair market value of the building in the condition in which defendant had covenanted to restore it, was greater than its fair market value in an unrestored state at the termination of the lease.

This case stands for the clear proposition that when plaintiff comes to trial, he bears a dual burden. He *must* first of all show what the cost of restoration (in this case, cost of repair) is. Thereafter, in order to benefit by the full measure of cost of repair, plaintiff must show that the diminution in fair market value exceeds the cost of repair.[7] In any event, recovery based on the cost of repairs is subject to an absolute ceiling of "diminution in fair market value." Here, plaintiff only carried half its burden. Cost of repairs were shown in

considerable detail. Diminution in value was virtually ignored. Plaintiff simply failed to meet and carry its burden of proof.

However, the Government did not ignore the two-fold burden. Defendant steadfastly maintained its "diminution in fair market value ceiling" argument.

The trial judge wrongly decided that diminution in fair market value was not a determining factor in awarding damages. However, the plaintiff was well aware of the Government's theory of the case. Had the trial judge ruled properly in this regard, plaintiff could have lost the case on insufficiency of evidence. At the very least, plaintiff should have laid the basis for protecting its case on appeal. As will be discussed fully, *infra*, plaintiff did not introduce sufficient evidence to support a finding of fact on fair market value of the property for either the day in or the day out. Plaintiff further did not except to Finding 22(c)[sic][d] as required by Rule 143(d). Finding 22(c)[sic][d] stated in part:

> There is no convincing evidence in the record on which one could reasonably determine what the fair market value of the Hospital property was in June 1966 or in January 1970.

Further, at oral argument, the plaintiff never availed itself of the opportunity to request submission of supplemental briefing or affidavits (showing fair market value) even after it became apparent that the court was gravely concerned about the relative absence of plaintiff's evidentiary showing. Finally, plaintiff never even pressed the court to consider remanding the case to the trial judge for further evidentiary proceedings on the diminution in fair market value issue.

In the case at bar, the Government introduced market value evidence which should have made it clear to plaintiff that its theo-

---

7. Put simply, plaintiff must show that he was damaged. *To require the defendant to expend great sums of money to repair the building, if the damage to the value of the building was de minimis*, is to work an injustice. For example, a tiny scratch on a picture window might be repairable only by replacing it at great expense,

yet the actual damage (the diminution in fair market value of the window) would be clearly be trivial. A measure of damages granting full replacement cost of a new picture window would be patently unfair and result in a windfall recovery.

ry was the diminution in value ceiling, and yet plaintiff—aware that were the Government correct, plaintiff would not have met its burden—did not provide appropriate evidence to protect its case. Plaintiff was on notice.[8] Since it plainly could have introduced evidence to "cover" itself in case the Government's theory proved to be correct, and chose not to do so, we do not feel constrained to remand the case for further findings, thus giving plaintiff a "second bite at the apple."[9]

We now turn to an analysis of the evidence of diminution in fair market value received in this case.

The evidence the Government introduced was opinion evidence of Arthur C. Schneider, a real estate appraiser. Mr. Schneider testified from a report he prepared November 19, 1974 that on the "day in," the fair market value of the property was zero. Mr. Schneider further testified that on the "day out," the fair market value of the property was, again, zero.

Mr. Schneider (hereafter Mr. Schneider, Jr.) had visited the site in July 1966 with his father (hereafter Mr. Schneider, Sr.). Mr. Schneider, Sr. had been hired to appraise the property pursuant to the Economy Act, 40 U.S.C. § 278a (1970). The rental figure agreed to by the parties had to be less than 15% of the appraised fair market value. Mr. Schneider, Jr. once again visited the site in August 1969, this time as an appraiser (as versus an observer, as was his position in July 1966) for a private concern.

To capsulize, Mr. Schneider, Jr.'s opinion evidence of zero value at "day in" was based upon his eight-year-old recollections of conditions existing when he accompanied his father in 1966. His finding of zero value on "day out" was based on his own appraisal (five months prior to "day out").

The plaintiff relies on Mr. Schneider, Sr.'s 1966 appraisal of $1.2 million, (Government's exhibit # 1) to evidence value on "day in." It relies on a letter evidencing a possible $500,000 offer in 1969 for the property to show evidence of value on "day out."

Considering first the conflicting "day in" evidence, it appears to us that the trial judge correctly determined that the evidence was inconclusive.

First, Mr. Schneider, Jr.'s zero value evidence is, according to the trial judge's Finding 22b, "based on his July 1966 site visit and utiliz[ed] a lot of the data contained in his father's appraisal report." Mr. Schneider's 1974 report then is based on memory of events eight years past, and though using Mr. Schneider, Sr.'s data, comes out with a glaring discrepancy in appraised value.

Mr. Schneider, Sr. determined the fair market value to be $1.2 million. The trial judge found this $1.2 million figure unreliable. As Trial Judge Lydon points out, the Economy Act, 40 U.S.C. § 278a (1970) provides:

. . . any rental cost to be reimbursable to Delta could not exceed 15 percent of the fair market value of the rented premises. The qualified appraiser, deceased at the time of trial, was of the opinion the property had a fair market value of $1,200,000. This rounded-off figure consisted of $1,172,949 for the improvements and $48,800 for the land. The evidence of record fails to persuade

---

8. The Government, by arguing and offering evidence of zero fair market value, does not imply that there existed either no salvage value, or no value for the land on which Missouri Baptist was situated. Salvage and land value diminution, however, are not the subject of this suit. The subject matter of this suit is the diminution of fair market value of the Hospital.

9. At this point, it may be worth noting that plaintiff alleged in its initial petition that the leased premises were diminished in value by $1 million, and that the Government was liable therefor. Plaintiff states in its final brief that

the trial judge "rejected plaintiff's damage claims based on diminution in value and chose to find damages based on repair cost, [and] plaintiff has now elected to accept damages measured by such repair cost." (Plaintiff's Reply Brief, p. 13). This can only provide further indication that plaintiff understood the nature of the conflict between its damage theory and the Government's. It originally, in its initial petition, *sought damages based on diminution in value*, and yet introduced no valid evidence in this regard.

that this opinion represents a reasonable indication of the fair market value of the building and property in July 1966. The appraisal was made specifically for the purpose of supporting a rental figure which, to be reimbursable, must fall within a certain range. Further, the basis for the value opinion on the improvements was not comparable sales but depreciated reproduction costs, a most unsatisfactory fair market value approach. *See Schoeffel v. United States,* 193 Ct.Cl. 923, 936 (1971). *See also, Westchester County Park Commission v. United States,* 143 F.2d 688, 693 (2d Cir. 1944), *cert. denied,* 323 U.S. 726 [65 S.Ct. 59, 89 L.Ed. 583]. Accordingly, there is no reliable evidence in the record as to the fair market value of the old building in June—July 1966. (Trial Judge Opinion at 17–18, n.4)

This quote shows that despite the theoretical correlation between the 1966 opinion of the appraiser and the rental payments, the actual fair market value may well have been significantly less.

Based upon Mr. Schneider, Jr.'s appraisal which we feel may be flawed due to the passage of time and the related potential lapse in memory, the glaring discrepancy in values grounded on much of the same raw data (as contained in Mr. Schneider, Sr.'s report) and the problems with Mr. Schneider, Sr.'s opinion itself, we agree that no reasonable determination of fair market value on the "day in" can be gleaned from the record.

Turning now to evidence of fair market value at "day out," we have Mr. Schneider, Jr.'s appraisal of zero value presented by the Government, and the letter evidencing a possible offer of $500,000 in 1969 presented by the plaintiff.

Mr. Schneider, Jr.'s appraisal for "day out" is not subjected to the same infirmity which weakens his "day in" appraisal. Here, the appraisal was his *own,* performed at a date near the actual "day out."

■ The trial judge relied on a letter in the record to dispute Mr. Schneider's testimony concerning zero value on "day out." Unfortunately, the letter was wrongfully received and wrongfully used. In Finding 12a, the trial judge finds that the Board of Trustees of the Hospital received a letter from Edward L. Presnell which essentially stated that Mr. Presnell had a client who "*may* still be interested in offering $500,000 all cash . . . ." for the property. (emphasis added) This evidence, in its present form, is inadmissible to establish value. In *Sharp v. United States,* 191 U.S. 341, 349, 24 S.Ct. 114, 115, 48 L.Ed. 211 (1903), the Supreme Court concisely stated the reasons why offers (such as this one, and Presnell's letter does not even rise to the dignity of an offer) are not admissible to establish value:

It is frequently very difficult to show precisely the situation under which these offers were made. In our judgment they do not tend to show value, and they are unsatisfactory, easy of fabrication and even dangerous in their character as evidence . . .

Since the letter was inadmissible to determine fair market value, it was both improperly admitted and improperly used as a countervalent to Mr. Schneider's testimony concerning zero fair market value at the "day out."

■ We therefore find, based on the record in this case, that Mr. Schneider's evidence of zero value on "day out" is not contradicted. We are satisfied that the fair market value on day out *was* zero, and so find.

■ We note at this point that "zero value at day out" could have been found by the trial judge. In view of this possibility, we are further at a loss to see why plaintiff at least did not present evidence of his own for a fair market value at "day in." Had there been any credible proof of "day in" fair market value, when compared with zero value "day out" finding, at least *some* recovery might be allowed. In fact, were the "day in" value (discounting vandalism and ordinary wear and tear) higher than the cost of repairs in this case, a full cost of repair recovery could have been allowed. It must be remembered, that if the "diminution in fair market value" attributable to

the breach exceeds the "cost of repair" measurement of damages, the entire "cost of repair" may be awarded. In any event, "cost of repair" damages are the maximum recovery one can receive, regardless of the diminution in value (*See*, "watch example," *supra* at p. 294).

Plaintiff, at oral argument, said:

. . . [T]he reason why plaintiff did not attempt to produce an appraiser to say what this building was worth at the beginning of the lease and what it was worth at the end of the lease was that the beginning of the lease was some four years prior to the termination date in January 1970. And we felt that no appraiser could get on a witness stand and competently testify that this building had X value back in 1966. And we also cross-examined the Government's witness quite heavily on this same issue, particularly since the individual had not even attempted to appraise it but had been with his father on an inspection tour back in 1966. At the time that we talked to appraisers there was no building left to appraise. And for the same obvious reason you can't ask an appraiser to get on the witness stand and say this building was worth X dollars on such and such date if no building was there to appraise . . . impossible burden . . . .

We are not persuaded by plaintiff's argument. It is a common occurrence for appraisers to give opinions even where the appraised property no longer exists, using such indices as sales of other property in the neighborhood, etc. We find no persuasive excuse for plaintiff's failure to have carried his burden of proof. *Dodge Street Building Corp., supra.*

■ We are thus left with the following situation: Plaintiff has failed to carry its burden of proof at trial. The trial judge properly found no conclusive evidence of value on "day in;" we find a zero fair market value on "day out." Plaintiff, by failing to except to the trial judge's finding of no evidence of value (it could have excepted saying Mr. Schneider, Sr.'s $1.2 million appraisal was conclusive) cannot con-

test the finding. Rule 143(d). *See, General Electric Co. v. United States,* 416 F.2d 1320, 1322, 189 Ct.Cl. 116, 118 (1969). Plaintiff never pressed for a remand, never offered to file supplemental briefs or affidavits, or even attempted to except to the finding at as late a stage as oral argument.

The court also notes at this juncture that the case for denying plaintiff "remand relief" is very strong here. It has been held in *S.O.G. of Arkansas v. United States,* Ct.Cl. No. 4–75 (Order, March 4, 1977):

Where a new subject is brought into the case by questions at oral argument [and in the case at bar, the "diminution in value" theory was hardly new] a party which feels that the record or briefing as they stand, inadequately present its position on that matter shall so inform the court at the argument or promptly thereafter. [*Citing General Electric Co. v. United States,* 416 F.2d 1320, 1321–22, 189 Ct.Cl. 116, 117–18 (1969).]

We therefore hold that plaintiff failed to carry its burden of proof.

This concludes our discussion of the major issues raised by the parties. We now turn to issues raised in the various counter-claims of the parties. Since we hold that the trial judge properly decided them in Part III of his opinion, we adopt that portion. It follows hereafter:

### OPINION OF THE TRIAL JUDGE

LYDON, Trial Judge:

#### Part III

■ Defendant's first counterclaim is based on the following pertinent provisions of the *Repair and Maintenance* clause (Article XIII) of the lease:

* * * Repair costs for a single undertaking exceeding One Thousand Dollars ($1,000.00) shall be deemed a major repair and the costs thereof in excess of One Thousand Dollars ($1,000.00) shall be born [sic] by the Lessor. In no event shall the Lessor be required to pay more than Five Thousand Dollars ($5,000.00) for any twelve (12) month period of the

lease. Any repairs costing in excess of said amounts (aggregating Six Thousand Dollars ($6,000.00)) within any twelve (12) month period of the lease, will be at the sole expense of the Lessee.

Defendant contends that in three separate 12-month periods, defendant (or Delta as assignor lessee) incurred major repair costs in excess of $6,000. During these three 12-month periods, defendant alleges plaintiff failed to meet the obligations placed on it by the above-quoted provision of the lease, i. e., paying for its share of major repair costs, such that it is now indebted to defendant in the sum of $13,-478.71 for breach of said lease requirement. The three 12-month periods in question were: (1) July 1, 1966–June 30, 1967; (2) July 1, 1968–June 30, 1969; and (3) July 1, 1969–January 31, 1970. It is significant to note that plaintiff paid Delta $5,000 under the above-quoted lease provision for repairs made by Delta during the period July 1, 1967–June 30, 1968. It is important to keep in mind that the provision, supra, concerns "Repair costs" and does not embrace other nonrepair-type costs incurred by Delta.

During the period July 1, 1966–June 30, 1967, Delta incurred costs of some $22,-484.54. These costs involved painting the exterior of the building and performing work relating to heating, air conditioning, elevators and plumbing. Delta made no request of plaintiff for cost contribution under the provision of the lease under consideration. This failure of Delta to request cost contribution generates an inference that said costs were not considered "Repair costs" contemplated by the lease provision in issue. This inference has support in the fact that in the follow-on period, July 1, 1967–June 30, 1968, Delta, when it incurred "Repair costs" considered to be within the purview of the lease provision, billed plaintiff for cost contribution under said lease provision and was paid by plaintiff. These

costs in the total amount of $8,246 involved repairs (emphasis supplied) to walk-in refrigerators, heat exchange and exterior brick walls of the building. Further, in February, 1969, plaintiff advised Delta that under the lease provision in question "repair costs * * * was intended to mean major repair and not operating maintenance." Neither Delta nor defendant disputed this interpretation at any time. Defendant has not disputed this interpretation in its brief.

During the period July 1, 1968–June 30, 1969, Delta incurred repair costs of $9,258. Delta billed plaintiff in April 1969 for $5,000 representing its cost contribution relative to said repairs under the lease provision in question. The record is most unsatisfactory on the matter, but warrants an inference that plaintiff paid this sum as billed. This inference is supported by the fact that the financial activities of Delta were closely audited by the Defense Contract Audit Agency, through its auditor Lee Newberry. He received a carbon copy of the invoice that Delta sent to plaintiff billing it for $5,000 as cost contribution. Newberry testified as a witness in this case and while he was not questioned specifically about whether or not payment had actually been received by Delta relative to the April 1969 billing, his responsibility to protect the government's interests relative to all costs incurred by the Job Corps center suggests that had some costs, as invoiced, not been paid by plaintiff, Newberry would have surfaced such a fact as part of his audit responsibilities.*

During the period July 1, 1969–January 31, 1970, Labor incurred costs of $6,478.71 applicable to work performed on elevators, sprinkler system and plumbing. Labor made no request for contribution by plaintiff under the lease provision, supra, relative to these costs. It is noted these costs are somewhat similar to costs incurred dur-

---

* Plaintiff, in any event, questions defendant's right to claim costs incurred by Delta and allegedly due and owing Delta by plaintiff prior to assignment, effective July 1, 1969, of the lease by Delta to defendant. The case relied on by plaintiff in this regard, i. e., Standard Live

Stock Co. v. Pentz, 204 Cal. 618, 269 P. 645 (1928), can also be read to support defendant's right to make the disputed claim it advances herein. However, it is not necessary to resolve this question in view of the disposition of the claim on other grounds.

ing the July 1, 1966–June 30, 1967, period for which Delta made no claim for contribution. The failure of Labor to bill plaintiff for these costs supports an inference that said costs were considered by it to be operating maintenance costs and not repair costs and thus beyond the pale of the lease provision in question.

The record will not support recovery by defendant of $13,478.71 under its first counterclaim.

Defendant's second counterclaim, filed just before trial in this case in January 1975, although its answer had been filed on February 25, 1972, is grounded on the provisions of Article XXIII, *Additional Rent*, of the lease, as supplemented. This Article also serves as the basis for plaintiff's claim for additional rent payments. Article XXIII provided in pertinent part as follows:

In addition to the provisions contained in Section II. of the original lease, Lessee shall pay to Lessor an additional yearly rental in the sum of Thirty Thousand Dollars ($30,000.00), to be paid in monthly payments of Twenty-Five Hundred Dollars ($2500.00) each, commencing at the same time as provided for rent payments in Section II. Such additional rent shall be for the purpose of reimbursing Lessor for real estate taxes, assessments and improvement liens paid upon the leased premises by Lessor. Should the total sum of all real estate taxes, assessments and improvements liens be less than Thirty Thousand Dollars ($30,000.00) annually, the Lessor will pay back the difference between the total sum of such taxes, assessments and improvement liens and Thirty Thousand Dollars ($30,000.00) to the Lessee, and an accounting for same and repayment shall be on or before the 15th day of January of each year. In no event shall the Lessee be required to pay or reimburse Lessor a sum greater than Thirty Thousand Dollars ($30,000.00) annually, for any real estate taxes, assessments, and improvement liens levied or imposed upon the leased premises.

Real estate taxes for 1969 on the leased property amounted to $23,138.21. Delta and/or Labor paid $20,000 (8 x $2,500), as invoiced by plaintiff, covering rental payments under Article XXIII for the months of January through August 1969. It is to be remembered that the lease was to expire by its terms on August 31, 1969. Effective September 1, 1969, plaintiff and Labor agreed to continue the lease on a month-to-month basis and also agreed to certain rental payment changes, which will be discussed, *infra*.

Defendant maintains that since it was required only to pay the real estate taxes for 8 of the 12 months of 1969, it should only be responsible for two-thirds of the total real estate taxes paid for the year ($23,138.21), or $15,425.47. Since it paid $20,000, it claims by way of its second counterclaim the difference ($20,000–$15,425.47) or $4,574.53.

Plaintiff, by way of a belated claim, asserted after the case had been tried, on the assumption of conforming the pleadings to the proof, seeks to recover an additional $3,138.21, representing the difference between the total real estate taxes paid for 1969 and the $20,000 it received from Delta and/or Labor during said year as additional rental.

There was no meaningful testimony at trial as to the construction, scope and reach of paragraph XXIII of lease. Indeed there was absolutely no evidence at all as to how the real estate tax situation was handled by the parties for the years 1966, 1967, and 1968. Paragraph XXIII of the lease specifically provided that an accounting was to be had for all real estate taxes paid and a repayment, if such be deemed necessary, was to be had on or before the 15th day of January of each year. Since there was no accounting had by and between the parties on or before January 15, 1970, or at any time thereafter, and no repayment was sought by either party within that period, it is not unreasonable to conclude that both parties contemporaneously, and before the matter was subjected to litigation, interpreted paragraph XXIII as requiring the $2,500 additional monthly rental payments by defendant for the 8 months in question.

This conduct on the part of the parties is more revealing than the dry language of Article XXIII by itself. *Macke Co. v. United States*, 467 F.2d 1323, 1325, 199 Ct.Cl. 552, 556 (1972). It is also noted that the paragraph made no provision for prorating the real estate taxes paid for a tenancy of less than 12 months, said paragraph speaking in terms of a yearly rental obligation of $30,000, to be paid in monthly payments of $2,500, with the repayment of any sum to Delta and/or Labor to represent the difference between $30,000 and the total sum of the real estate taxes paid. The situation in question does not fit squarely within the language of paragraph XXIII and thus the lack of an accounting and any request for repayment within the time frame of the paragraph itself, weighs heavily in the conclusion reached herein since the record offers no other evidence which bears on the matter. Defendant has made no persuasive argument, either factually or legally, which would justify granting it recovery on its second counterclaim.

What has been said above also serves to require denial of plaintiff's claim for additional rental payments for 1969. Moreover, other facts of record support this conclusion. Effective September 1, 1969, plaintiff and Labor renegotiated the rental payments to be thereafter made by Labor. It was agreed that the rental for September 1969 would be $10,416.66, and thereafter, commencing October 1, 1969, the monthly rental would be $5,208.33. There was no mention made in discussion or in correspondence between the parties at any time, relative to payment by Labor for September 1969 and succeeding months of an additional rental payment of $2,500, or any amount whatsoever, for real estate tax purposes. The testimony of plaintiff's witnesses does not support any such claim. Further, plaintiff's conduct during the period September 1969–January 1970 clearly indicates that defendant was not obligated to pay additional rental for real estate tax purposes. Prior to September 1969, plaintiff in billing Delta and/or Labor specifically invoiced for additional rental for real estate tax purposes. In its billings to Labor for September 1969 and thereafter, plaintiff significantly did not include in the invoices any claim for additional rental for real estate tax purposes. This conduct convinces that the parties did not intend that real estate taxes would be paid, as additional rental, by Labor to plaintiff during the period September 1969 and thereafter. *See Max Drill, Inc. v. United States*, 427 F.2d 1233, 1240, 192 Ct.Cl. 608, 620 (1970); *Universal Match Corp. v. United States*, 161 Ct.Cl. 418, 422 (1963).

In view of the above discussion, neither party is entitled to any recovery premised on Article XXIII of the lease.

## SUMMARY

In summary, we hold the trial judge to have erred in determining damages based solely on a *cost of repair* analysis without regard to a *diminution of fair market value* ceiling. Plaintiff's reliance on a possible distinction between *cost of repair* and *cost of restoration* is unfounded in view of the similarity in treatment of the two methods in the cases, and because the rationale of the rule as applied to *cost of restoration* cases (i. e., avoidance of windfall recovery) is equally applicable to *cost of repair* cases. We further hold that the burden of proof plaintiff is required to bear was not met. In addition to a showing of what the costs of repair would be, plaintiff also needed to demonstrate whether the *diminution in fair market value* measurement exceeded the *cost of repair* measurement. If plaintiff cannot show an excess of *diminution in fair market value* over *cost of repair*, his damages will be measured solely with regard to the diminution in value attributable to the Government's breach. In this case, we agree with the trial judge that there is no adequate and conclusive evidence indicative of a fair market value on "day in." However, from an examination of the record, we find the fair market value of the property on "day out" to have been zero. The trial judge erred in discounting the "zero value" appraisal by wrongfully receiving and wrongfully applying a letter ostensibly showing a "possible" offer of

$500,000 for the property. Evidence of an offer is inadmissible to prove fair market value.

Additionally, plaintiff failed to except to the trial judge's finding of "no convincing evidence" as to fair market value on "day in" and "day out." This is inconsistent with Court of Claims Rule 143(d). Having also failed to file supplemental briefing and/or affidavits, or even to press for a remand of proceedings, plaintiff has not postured itself in such a manner as to merit recovery.

NICHOLS, Judge, concurring:

I join in the judgment and in Judge Kunzig's persuasive opinion, though I was originally of another view. However, I do not believe, and do not understand the opinion to say, that covenants in leases to deliver the leased premises to the lessor in good condition at the end of the lease period, reasonable wear and tear excepted, are always and invariably nullities if the property had no fair market value at the beginning of the lease and at the end. If this were true, it would have consequences the court might not desire. There is, undoubtedly, at the present time, a great deal of "improved" urban real estate, that would be found on an unbiased appraisal to lack any fair market value. Owners may have reasons for wishing to preserve their property, perhaps a hope for better times, perhaps other considerations. They may want to have the property in possession of a responsible tenant rather than vacant and more fully exposed to vandalism, which even occupancy, in our state of urban decadence, no longer entirely guards against. In view of the decision we are making, the question might arise, how are they to require the lessee actually to keep the premises in good physical repair, market value consideration aside? Obviously they could spell it out. Should they fail to do so, such covenants might be implied from the attendant circumstances. Words in leases, as in other contracts, cannot always be given the same unvarying meaning.

If it appeared, for example, that the property was historic and destined, eventually, to become part of a restored historic section, as in Alexandria, Virginia, the parties might have so plainly covenanted with that consideration in their minds, that the conventional restoration language would have a different meaning.

While it was virtually impossible to show here, that the property had any fair market value at the beginning of the lease, the parties originally contracted with reference to an appraisal that indicated it did. This may have been, as the trial judge intimates, little better than an agreed fiction, but still it rebuts the idea one might otherwise entertain, that they contracted with a purpose to disregard market value considerations in their relations as landlord and tenant. In such circumstances it would be absurd to mulct the Government for not effecting repairs that would have been useless so far as their effect on market value was concerned. The trial judge's decision would have presented the hospital trustees with a mere windfall, where it looks as if they were fortunate indeed to derive the income they did from such worthless property, before the instant claim arose.

### CONCLUSION OF LAW

Upon the foregoing opinion, and the findings of fact of the trial judge as modified, which are hereby adopted but not printed, the court concludes that plaintiff is not entitled to recover any damages. The court also concludes that defendant's two counterclaims, and plaintiff's belated claim must fail. The petition and the counterclaims are dismissed.