FORRESTER A. CLARK and KATHARINE B. CLARK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clark v. Commissioner
Docket No. 1659-77.
United States Tax Court
T.C. Memo 1978-402; 1978 Tax Ct. Memo LEXIS 114; 37 T.C.M. (CCH) 1667; T.C.M. (RIA) 78402; October 5, 1978, Filed Philip M. Cronin and John R. D. McClintock, for the petitioners. David N. Brodsky, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in petitioners' joint Federal income taxes: Year
Deficiency
1971
$ 8,189.94
1972
86,244.21 After concessions, the only issue for our decision is the fair market value as of December 29, 1971, of certain improved real property located in Hamilton, Massachusetts, which was the subject of a charitable gift at that time. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of *115 facts with exhibits is incorporated herein by this reference. Petitioners Forrester A. Clark and Katharine B. Clark, husband and wife, resided in Hamilton, Massachusetts, when they filed their petition in this case. They filed their 1971 and 1972 joint Federal income tax returns with the Internal Revenue Service Center in Andover, Massachusetts.
Petitioners' 1971 residence in Hamilton was on an estate of some 330 acres, which they owned. The estate contained, in addition to the main dwelling (a mansion hereinafter described), a number of buildings, as well as a racetrack and other facilities appropriate to activities relating to horses. Petitioners were obviously persons of substantial means, having reported adjusted gross income in their 1971 and 1972 returns in amounts exceeding $ 1,000,000 and $ 900,000, respectively. On December 29, 1971, petitioners contributed to the North Shore Community Arts Foundation, Inc. ("North Shore"), a 10.26-acre parcel (the "subject property") containing the main dwelling, which was carved out of their larger estate. North Shore was an organization described in sections 170(c)(2) and 170(b)(1)(A)(vi), I.R.C. 1954, at the time of the contribution. *116 The 10.26-acre parcel is irregularly shaped. It has a frontage of 175 feet on Bridge Street (the minimum permissible under local zoning requirements) and goes back some 300 feet to the rear producing a rectangular shaped area of some 1.2 acres fronting on Bridge Street. At the rear of this rectangle, the parcel widens to some 700 feet and goes farther back some 800 feet, producing an area in back of the rectangle that is partially elliptical or "horseshoe" in shape. Petitioners retained the land fronting on Bridge Street on both sides of the rectangular area as well as the land surrounding the rear portion of the property. The only existing access to the subject property was through a private right-of-way on petitioners' retained lands that began on Bridge Street on one side, circled the property, and emerged on Bridge Street on the other side about 750 feet away. The donee was given only limited nonexclusive access to the subject property over one side of petitioners' retained existing right-of-way (up to a point even with the main house). However, it could have constructed its own roadway through the front rectangular portion of the property. The main dwelling was situated *117 some 750 feet back from Bridge Street, and to the rear thereof the subject property contained additional land about 350 feet deep on which were located a swimming pool, bath house, and a tennis court. No garages or other outbuildings were included in the gift. A 5-car garage that was apparently associated with the main dwelling was located on petitioners' retained lands outside the 10.26-acre parcel. The main dwelling on the subject property is a three-story, 25-room, brick replica of an English Tudor mansion house located in Sussex, England. It was built in about 1903 or 1904. The dwelling had a tile roof and leaded casement windows. Among the rooms on the first floor of the building were a formal dining room with expensive imported French wallpaper, a formal living room with paneling from France, a sitting room, library, social room, and a kitchen. The second floor contained eight bedrooms, two dressing rooms, a sewing room and six baths. The third floor had two separate apartment units, each with four rooms, bath and storage rooms. Altogether, there were nine baths. The first two floors reflected materials and workmanship of very high quality, but the third floor was of *118 lesser quality. The house had in excess of 13,000 or 14,000 square feet of living area. The mansion was, in general, well maintained at the time of the gift, and was quite handsome in interior and exterior appearance. The house had two heating systems, a forced hot air system and a hot water system, both of which were operated by large oil burners. In addition, because the hot air system could circulate air throughout the house, it could be used in the summer to blow cooler air from the cellar. The house was not otherwise air conditioned. The 60-foot by 30-foot swimming pool to the rear of the mansion was surrounded by hedges; and, as noted above, a tennis court and a bath house were also in the area behind the mansion. In front of the main dwelling was a large open mowed grass lawn. The lawn was used for sports. The subject property contained formal gardens as well as lawns, and all of the grounds were kept in immaculate condition. Petitioners had nine children who, together with petitioners, maintained the mansion and surrounding grounds. In addition, petitioners utilized outside cleaning and gardening help. An owner of the property without nine cooperative children *119 would require a staff of gardeners as well as a household staff to maintain the mansion and the acreage included in the 1971 gift -- two or three people "inside" and two or three people "outside". The subject property was zoned by the town of Hamilton as a residence R-1b district. This zoning contemplated primarily single-family use with a minimum lot size of 40,000 square feet and minimum street frontage of 175 feet. However, certain public uses of the land (schools, museums, libraries, parks, and the like) were also permitted, as were some religious uses (churches, religious and denominational schools). Hamilton is located in the center of a group of attractive and prosperous communities in the north shore area of Massachusetts and is a beautiful town. It had a population in 1975 of 6,675. The town is primarily a residential community with a very small commercial area. Hamilton is widely associated with horse training and has an appeal for persons interested in equestrian events; it is used by the United States Equestrian Team as a training site. Myopia Hunt Club is located in the southern part of Hamilton, adjacent to the town of Wenham. Petitioner Forrester A. Clark *120 is a member of the club, and had been its president for an unspecified period of time. The subject property is about one and one-half to two miles from the town center. The immediate neighborhood surrounding the subject property consists of sparsely settled, rolling countryside. The open character of much of the land will be preserved as a result of charitable gifts for conservation purposes. The highest and best use of the subject property at the time of the gift was for institutional or other tax exempt use. This form of usage was, however, only a slightly higher form of use compared to use of the property for residential purposes. Shortly after petitioners gave the property to North Shore, the donee organization considered a proposal to use the subject property as part of a drama school complex. North Shore did not undertake this project because of a sizable projected budget deficit. The Trustees of North Shore subsequently determined that they had no use for the property, and conveyed the property by gift to the town of Hamilton with the expectation that the mansion would be used as a Town Hall. When the town decided not to use the property in this manner, it was *121 leased by the town to the U.S. Equestrian Team for $ 1.00 per year under three five-year renewable leases. Under the lease arrangement, the Equestrian Team became responsible for maintaining the subject property. The Team used the subject property in conjunction with other facilities (jumps, etc.) on other portions of petitioners' retained estate, which were made available to the Team. Petitioner Forrester A. Clark testified that at the time of the gift he was of the opinion that the subject property had a fair market value of $ 750,000. Nevertheless, petitioners deducted as a charitable contribution on their 1971 return only $ 425,000 in respect of their 1971 gift of the subject property and carried over a portion thereof to their 1972 return. They reported this lower value in reliance on the opinion of Robert Noone, an expert appraiser retained by the Clarks to value the 330-acre parcel of land in Hamilton, of which the subject was a part. Mr. Noone separately determined a fair market value of $ 425,000 for the subject property as of December 29, 1971. At trial, Mr. Noone testified that he was still of the opinion that his original valuation was correct. Petitioners also *122 presented at trial the testimony of Edmund S. Balboni, another expert appraiser, who stated that in his opinion the subject property was worth $ 435,000 as of December 29, 1971. The Commissioner presented at trial the testimony of his own expert appraiser, John S. Cullen, who testified that in his opinion the subject property had a fair market value of $ 275,000 as of December 29, 1971. The three experts who testified at trial and whose appraisal reports were submitted in evidence based their appraisals on the comparable sales method or a variant thereof. None of the three appraisers relied on the cost of reproduction of the mansion house. Except for one theological property cited by Mr. Noone, none of the comparable sales used by the appraisers were sales for institutional use. The Commissioner, in his notice of deficiency, determined that the fair market value of the subject property in 1971 was $ 300,000, instead of the $ 425,000 claimed. He accordingly disallowed a portion of petitioners' charitable deductions to the extent that they were based on the higher value. OPINION The only issue presented by this case is the fair market value of 10.26 acres of improved *123 land in Hamilton, Massachusetts, as of December 29, 1971. On that date, petitioners made a deductible charitable contribution of the land, together with a 25-room brick mansion, a swimming pool, bath house and a tennis court. Petitioners filed their 1971 and 1972 returns using a $ 425,000 valuation for the subject property. At trial, their two appraisers testified in favor of a $ 425,000 and $ 435,000 valuation, respectively. The Commissioner determined a fair market value of $ 300,000, and his expert witness was of the opinion that the property was worth only $ 275,000. We had ample opportunity to evaluate the testimony of the three experts, and in our judgment Mr. Cullen's analysis and conclusions furnished a more reliable guide to the determination of the fair market value of the subject property. And although the evidence shows not only that the subject property was quite handsome and that the cost of reproduction would have been considerably higher, we think that its fair market value was closer to that urged by the Commissioner than to the value claimed by petitioners. It would serve no useful purpose to make a detailed analysis of the testimony of these three experts *124 and to explain item by item the extent to which we agree or disagree with their analyses. Valuation is not a precise science, and the ultimate conclusion to be reached is purely one of fact. Cf. Chesapeake and Ohio Ry. Co. v. Commissioner,64 T.C. 352, 391, 392. However, we will note some of the considerations that we took into account in our determination. In their reports, all three expert appraisers agreed that the subject property suffered from functional obsolescence due to the character and extremely large size of the mansion and grounds. We think that the high costs and relative impracticability of maintaining the mansion and grounds (cleaning, heating, gardening, etc.) were primary factors causing loss of value of the subject property in 1971. In the case of a functionally obsolete property, high replacement cost is not an indicium of high value, since it is unlikely that an obsolete property would be reconstructed in its obsolete form. None of the experts gave weight to the replacement cost of the dwelling. And although in a sense petitioner Forrester A. Clark may have been quite correct in his judgment that the property was "worth" $ 750,000, we *125 cannot give much weight to his testimony in this regard when considered in the context of the entire record.[1] The evidence was persuasive that large mansions or estate-type properties had lost much of their appeal, resulting in a reduction of their fair market value. A significant *126 flaw in the opinions and testimony of petitioners' experts was that neither expert appeared to give sufficient consideration to the size of the Clark mansion and the negative impact on value that its excessive size had in the marketplace. Petitioners' experts did not bring to our attention any truly comparable mansion as large as the subject that sold for a price, either in absolute terms or per square foot, as great as that they would have us find here. [2] Instead, they relied upon sales that we regard as far from comparable, and they offered only conjecture to support their view that the superior amenities of the subject property could offset the adverse effects of its size on the market. *127 We were impressed with the analysis by respondent's expert, Mr. Cullen, of the February 1972 sale of the so-called "Cabot" property for $ 239,500. [3] It was described as consisting of a handsome 25-room Georgian Colonial brick mansion with 8 full baths and 3 half baths. The total amount of living space appears to have been somewhat less than that in the Clark mansion, and the condition of both mansions was similar. The evidence shows that the grounds of the Cabot mansion were beautiful; the entire parcel consisted of 42 acres with 25 acres of upland and 17 acres of marsh and marginal land, and contained a swimming pool as well as a 6-car heated garage. We found credible Mr. Cullen's opinion that its location in nearby Wenham was superior to that of the subject property and that its land value was superior. While we are satisfied that the Cabot property was sold at a price that was probably not fully equal to its fair market value, we do not find, as urged by petitioners, that it was disposed of in a distress sale. To be sure, the sale was prompted by a divorce, but the seller (Mr. Cabot) was described as a wealthy man who was worth about $ 100,000,000, who was not strapped for *128 funds, and who did not appear to have been under any economic pressure to make the sale. The Cabot property appears to be more comparable to the subject property than that involved in any of the sales relied upon by petitioners' experts. We think that the Cabot sale furnishes a useful guide in arriving at the fair market value of the subject property, after making an appropriate upward adjustment to take into account the fact that it was sold for residential purposes and that the purchaser may have obtained a "bargain".
*129 We have carefully reviewed the evidence relating to all of the alleged comparable sales relied upon by all three experts. As already noted, valuation is not an exact science, and we are required to use our best judgment on all the evidence. We found Mr. Cullen's testimony more convincing than that of petitioners' two experts. However, we did conclude that Mr. Cullen's upward adjustment for the subject property was not sufficient. Based upon all the evidence it is our best judgment and we hereby find as a fact that the subject property had a fair market value of $ 325,000 as of December 29, 1971, the date of the gift. We hardly need add that the value we have found represents merely the amount that, in our opinion, the property would bring upon the open market after being exposed for a reasonable length of time where both the seller and the buyer are acting free of any compulsion and are informed of all relevant facts. It does not represent the cost of reproduction, nor any other standard of "worth". And we emphasize that such value is determined as of 1971, not as of 1974, and not as of today when inflationary and other factors might conceivably require a significantly higher *130 valuation. Decision will be entered under Rule 155.
Footnotes
1. Petitioners make a contention, allegedly to show the marketability of the property, that they received offers to purchase the property from them for $ 750,000 in 1972, the year following the gift. These offers purportedly came from a real estate broker and the Gulf Oil Company. However, apart from the doubtful admissibility of such evidence (cf. Sharp v. United States,191 U.S. 341, 349; Missouri Baptist Hospital v. United States,555 F. 2d 290, 298↩ (Ct. Cl.)), the testimony in this respect was vague and unsatisfactory. In the first place, the so-called offers may have involved at most merely exploratory inquiries; and, secondly, we are far from satisfied on the record that they did not relate to petitioners' entire 330-acre estate or a major portion thereof rather than to the artificially carved out 10.26-acre portion which was the subject of the charitable gift.
2. Mr. Noone admitted that a $ 2,000,000 sale of a 127-acre parcel for religious school purposes, cited in his report, was not comparable to the subject property. The parcel contained a very large dwelling used as a convent, a modern chapel and numerous outbuildings.
The sale of another property (the so-called "Pearson" property) which occurred in 1974 is strongly pressed upon us by petitioners on brief as supporting the conclusions of their experts. We do not regard this sale as furnishing a reliable guide to the value of petitioners' property. Not only was it made in 1974 (at a time when, as indicated by one of petitioners' experts, its value was higher than in 1971), but the evidence shows that the purchaser understood that the original portion of the dwelling was built around 1700 and that its antique or historical value was of importance to him. Moreover, that sale was also lacking in comparability to the subject property because some 93 or 94 acres were involved, notwithstanding the configuration of the property and the fact that some 20 or 25 acres thereof consisted of marsh or "wetlands".↩
3. Petitioners objected to the admission of the sales price of the property as hearsay. This objection is without merit. Under the Federal rule, hearsay evidence of comparable sales prices may be admitted to show the basis of the expert's opinion. See, e.g., Bailey v. United States,325 F. 2d 571, 572-573 (C.A. 1); United States v. 60.14 Acres of Land,362 F. 2d 660, 669 (C.A. 3); cf. Fed. R. Evid. 703↩. Furthermore, we have more than mere hearsay evidence in this case. We have Mr. Cullen's sworn testimony that he examined the sales tax stamps on the deed which were consistent with the stated sales price. While not conclusive, we found this evidence convincing, and it represents an independent basis for accepting the $ 239,500 sales price as accurate.